Albert C. **BRODERS, M.D., Franklin James Fleischhauer, M.D., Dirk Anthony Frater, M.D., and Presbyterian Hospital of Dallas, Petitioners,**

v.

**Robert A. HEISE and Grace N. Heise, Individually and as Representatives of the Estate of Kathleen Heise, Respondents.**

No. 95–0168.

Supreme Court of Texas.

Argued Nov. 28, 1995.

Decided June 14, 1996.

---

John H. Martin, Deborah G. Hankinson, Beverly Ray Burlingame, Gerald W. Benson, Dallas, for petitioners.

James E. Girards, David R. Weiner, John K. Horany, Dallas, for respondents.

PHILLIPS, Chief Justice, delivered the opinion for a unanimous Court.

We must decide whether the trial court abused its discretion in excluding the testimony of an emergency physician that the conduct of the three defendant emergency physicians and the defendant hospital was a cause in fact of a patient's death. Because plaintiffs did not meet their burden to show that their expert had "knowledge, skill, experience, training or education" which would "assist the trier of fact" in deciding the issue of cause in fact, TEX.R. CIV. EVID. 702, we conclude that the trial court did not abuse its discretion. We reverse the judgment of the court of appeals, 888 S.W.2d 264, and render judgment in accordance with the jury's verdict that plaintiffs take nothing.

## I.

Paramedics brought Kathleen Heise to Presbyterian Hospital of Dallas around 9:30 p.m., April 7, 1988, after having picked her up in response to calls for help from passers-by who found her unconscious on the sidewalk. Eyewitnesses established that she had been assaulted and perhaps choked, although the assailant has never been identified or apprehended. By the time she got to the hospital, she was conscious and could walk around, but she vomited almost immediately upon her arrival, would not respond to questions, and refused to be examined by Dr. Albert C. Broders, the attending physician. After she expressed a wish to leave, Dr. Broders requested a security guard to ensure that she not leave.

Heise vomited again around 10:15 p.m.; but other than somewhat frequent trips to the bathroom, she slept most of the night. A little after 4:00 a.m. she complained of a headache and was given a pain reliever. Finally, around 6:30 a.m., Heise allowed Dr. Dirk Anthony Frater, who had assumed responsibility from Dr. Broders, to perform a complete examination, including blood and urine tests and a chest x-ray. Dr. Frater testified that he found no swelling, bruises, tenderness or other external evidence of injuries to her head, although he did note a contusion over one eye. Because she admitted that she had been drinking the night before, Dr. Frater attributed her mild headache to a hangover. Early that afternoon, Dr. Frater released Heise to the care of her boyfriend, Timothy Connors.

Around 9:30 p.m., Connors brought Heise back to the Hospital because she was vomiting, sensitive to light, and suffering an intense headache. Dr. Franklin James Fleischhauer, who was then on duty in the emergency room, immediately prescribed Demerol, a narcotic, as well as Phenergan, a synthetic narcotic which increases the effects of Demerol, and ordered a CT scan. After the scan, Heise suffered respiratory arrest, but she was soon revived. Dr. Fleischhauer consulted a neurosurgeon, Dr. Richard Weiner, who analyzed the CT scan and concluded that Heise had suffered a fractured skull, with both bleeding and swelling in her brain.

He prescribed a diuretic, Mannitol, to help reduce brain swelling, but to no avail. Heise died at 11:20 a.m. the next day, April 9, 1988. The autopsy stated the cause of death as "craniocerebral injuries," apparently sustained during the assault, including "extensive mechanical disruption" throughout the different brain tissues. At trial, defendants' experts described these disruptions as resembling fractures in a bowl of custard.

Robert and Grace Heise, the decedent's parents, filed a wrongful death suit against Presbyterian Hospital and the three emergency room physicians, Drs. Broders, Frater, and Fleischhauer. The Heises claimed that all the emergency room doctors and nurses were negligent in failing to promptly diagnose and treat their daughter's head injury during her initial admittance and that Dr. Fleischhauer was further negligent in prescribing Demerol and Phenergan. They argued that this negligence was a proximate cause of her death. The defendants countered that Heise had sustained an irreversible, untreatable, and fatal brain injury at the time of the assault. Nothing the doctors and nurses did or did not do, whether negligent or not, could, they argued, have been a cause in fact of Heise's death. Thus, plaintiffs could not prove an essential element of their case.

At trial, plaintiffs called Dr. Frederick Joseph Condo as an expert witness. They sought to qualify Dr. Condo by proving that he had been licensed as a medical doctor since 1961 and had practiced emergency medicine since 1980. Dr. Condo testified that he was trained in "the brain and its functions" in medical school and had actual experience treating head injuries as a doctor aboard an emergency helicopter, where he was required to "stabilize the patient for transport." As an emergency room doctor, he said he had "to understand and appreciate . . . what services can be provided by a neurosurgeon . . . in order to know which type of physician to recommend."

Dr. Condo testified without objection about the standard of care, that defendants failed to meet that standard, and that it was foreseeable that an untreated head injury could lead to death. He stated that a physician's

applicable standard of care involves evaluating all the possible conditions from which a patient could suffer based on the patient's history, then eliminating those possibilities one by one. He said that the nurse's standard of care was to make thorough observations of the patient and to inform the doctors accurately about those observations. Under these standards, Dr. Condo testified that the physicians had sufficient reason during Heise's first admittance to the emergency room to believe that she might be suffering from a head injury. Therefore, he concluded that they should have ordered a CT scan earlier and prescribed diuretics sooner. He also testified that the nurses breached the standard of care in failing to inform the doctors directly of several symptoms that they had recorded on Heise's chart, including that: she may have had a seizure before she arrived at the hospital; she vomited twice; she reported a headache; and she jumbled her words in stating that she wanted to go home.

Dr. Condo offered further testimony by bill of exception that one cause of Heise's death was "that there was no treatment rendered in reference to the—this head trauma." Dr. Condo's belief was that "[i]n all medical probability, had intervention—diagnosis—early diagnosis and treatment been rendered, [Heise] would have survived." When asked: "[B]ut for the negligence of the nurses, would Kathy Heise have survived?" he answered, "Yes." Finally, he opined that "the administration of Demerol with Phenergan superimposed on her pre-existing condition, if not was [sic] an actual cause of her stop—stopping to breathe, certainly it contributed to that." However, the trial court sustained defendants' objections to this testimony on the basis that Dr. Condo was not competent to offer these opinions. As the Heises offered only one other expert witness, a nurse who was also unqualified to testify on causation, they were left without evidence of an element of their claim.

Defendants presented the expert testimony of two neurosurgeons, Dr. Duke Samson and Dr. Richard Weiner, who both testified that Heise had suffered a diffuse mechanical disruption to the cerebral cortex, the cerebellum and the brain stem, which resulted in general swelling of the brain tissues. Each concluded that the disruption itself was inoperable and untreatable. Both also believed that any efforts to control the resultant swelling would, in all medical probability, have been inadequate to reduce the swelling enough for the necessary length of time.[1] Dr. Samson testified that "between eighty-five to ninety-five percent of patients that have this problem will die or be in a persistent vegetative state." Dr. Weiner went further, testifying that given the extent of the disruption to her brain tissue, Heise had "no chance" of survival after the assault.

The jury returned a verdict for the defendants, and the trial court rendered a take-nothing judgment on the verdict. The court of appeals held that the trial court abused its discretion by excluding Dr. Condo's testimony on cause in fact, because Dr. Condo met the requirements of Rule 702 by "possess[ing] knowledge and skill not possessed by people generally." 888 S.W.2d at 266. Because the court concluded that "the whole case turned on the excluded evidence," it held that "the error in excluding such testimony of Dr. Condo ... probably did cause the rendition of an improper judgment." 888 S.W.2d at 267.

## II.

The qualification of a witness as an expert is within the trial court's discretion. *Cf. E.I. du Pont de Nemours and Co. v. Robinson,* 923 S.W.2d 549, 558 (Tex.1995); *Ginsberg v. Fifth Court of Appeals,* 686 S.W.2d 105, 108 (Tex.1985). We do not disturb the trial court's discretion absent clear abuse. "The test for abuse of discretion is whether the trial court acted without reference to any guiding rules or principles." *E.I. du Pont,* 923 S.W.2d at 558. Further, the party offering the expert's testimony bears the burden to prove that the witness is qualified under Texas Rule of Civil Evidence 702.

---

1. According to their testimony, the degree of brain swelling suffered by Heise increases intracranial pressure to the point where the brain stem, the regulator of body functions such as heartbeat and breathing, is destroyed.

GOODE, ET AL., GUIDE TO THE TEXAS RULES OF EVIDENCE: CIVIL AND CRIMINAL, § 702.3 n.1 (Texas Practice 1988). *See also, Matson v. State,* 819 S.W.2d 839, 851 (Tex.Crim.App. 1991) (construing identical criminal evidence rule). Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise.

TEX.R. CIV. EVID. 702. We thus examine the trial court's ruling under these standards.

■ The Heises first assert that Dr. Condo was qualified as an expert merely because he is a medical doctor. They read this Court's opinion in *Hart v. Van Zandt,* 399 S.W.2d 791, 797–98 (Tex.1965), as holding that every medical doctor is qualified to testify as an expert on all medical matters in a suit against a medical doctor because they are of "the same school of practice." They argue:

> Dr. Condo's testimony ... was admissible under *Van Zandt* because he and the defendant doctors are of the same school of practice, that is, they are all medical doctors. As far as Dr. Condo's testimony on cause-in-fact related to a matter involving neurosurgery, he was still qualified under *Van Zandt* because the "same school of practice" does not mean the same specialty.

The court of appeals apparently agreed with the Heises' characterization of *Van Zandt.* 888 S.W.2d at 266. We do not. The Court in *Van Zandt* was responding to a defendant's complaint that the plaintiff had "failed to prove the essential elements of his cause of action 'by a doctor of the same school of practice as the defendant.'" *Van Zandt,* 399 S.W.2d at 797. The Court noted that "[a]ll of the doctors who testified, with the exception of Dr. Charles M. Hawes, who is an osteopath, hold M.D. degrees, so it is apparent that the objections ... are leveled at the testimony of Dr. Hawes." *Id.* The Court held, however, that Hawes was qualified under the common law rule allowing an

expert of a different school to testify so long as the "subject of inquiry is common to and equally recognized and developed" in both fields. *Id.* at 797–98 (citing *Porter v. Puryear,* 153 Tex. 82, 262 S.W.2d 933, 936 (1953)).

*Van Zandt* does not go on to say that experts who are medical doctors are automatically qualified by virtue of their medical degrees. The petitioner in *Van Zandt* had not complained about the qualifications of plaintiff's experts generally, but only complained that the plaintiff's experts could not offer admissible evidence because they had not met the school of practice test. Thus, in *Van Zandt,* we never reached the issue before us here. Consequently, all one can learn from *Van Zandt* is that the other experts passed the "school of practice" test and that the petitioner had made no other objections to them. For this reason, we do not believe that either the letter or the spirit of *Van Zandt* supports the Heises' interpretation that any medical doctor can always testify on any issue against any other medical doctor in a malpractice case. That it is necessary for an expert to be either from the same school of practice or from a school in which the subject at issue "is common to and equally recognized and developed," does not at the same time make such a requirement sufficient to qualify the testimony. *See Milkie v. Metni,* 658 S.W.2d 678, 679–80 (Tex.App.—Dallas 1983, no writ) (medical doctor unfamiliar with appropriate treatment not qualified to testify in medical malpractice case).

Moreover, given the increasingly specialized and technical nature of medicine, there is no validity, if there ever was, to the notion that every licensed medical doctor should be automatically qualified to testify as an expert on every medical question. Such a rule would ignore the modern realities of medical specialization. The Heises' proposed rule would also eliminate the trial court's role of ensuring that those who purport to be experts truly have expertise concerning the actual subject about which they are offering an opinion. After all, the proponent of the testimony has the burden to show that the expert "possess[es] special knowledge as to

the very matter on which he proposes to give an opinion." 2 RAY, TEXAS LAW OF EVIDENCE: CIVIL AND CRIMINAL § 1401 at 32 (Texas Practice 3d ed.1980). *See also Missouri Pac. R. v. Buenrostro,* 853 S.W.2d 66, 77 (Tex. App.—San Antonio 1993, writ denied).

Even if *Van Zandt* held as the Heises contend, however, this Court's subsequent adoption of the Texas Rules of Civil Evidence would limit *Van Zandt*'s authority. Perhaps because of this, the Heises also argue, and the court of appeals also held, that Dr. Condo's testimony met the requisites of Rule 702. Again, we disagree.

■ The rule requires that experts be qualified "by knowledge, skill, experience, training, or education," and that their testimony "assist the trier of fact." TEX.R. CIV. EVID. 702. That Dr. Condo, as the court of appeals noted, "possessed knowledge and skill not possessed by people generally," 888 S.W.2d at 266, does not in and of itself mean that such expertise will assist the trier of fact regarding the issue before the court.

■ Dr. Condo's medical expertise is undoubtedly greater than that of the general population, but the Heises did not establish that his expertise on the issue of cause in fact met the requisites of Rule 702. While he knew both that neurosurgeons should be called to treat head injuries and what treatments they could provide, he never testified that he knew, from either experience or study, the effectiveness of those treatments in general, let alone in this case. On this record, the Heises simply did not establish that Dr. Condo's opinions on cause in fact would have risen above mere speculation to offer genuine assistance to the jury.

Federal courts have reached similar results in decisions interpreting Federal Rule of Evidence 702. The Fifth Circuit, for instance, has focused, as we do, on whether the expert's expertise goes to the very matter on which he or she is to give an opinion. In *Christophersen v. Allied–Signal Corporation,* 939 F.2d 1106, 1112–1113 (5th Cir.1991), *cert. denied,* 503 U.S. 912, 112 S.Ct. 1280, 117 L.Ed.2d 506 (1992), the court noted:

> The questions ... do not stop if the expert has an M.D. degree. That alone is not enough to qualify him to give an opinion on every conceivable medical question. This

is because the inquiry must be into actual qualification. . . .

*See also Nunley v. Kloehn,* 888 F.Supp. 1483, 1488 (E.D.Wis.1995) ("The focus, then, is on the 'fit' between the subject matter at issue and the expert's familiarity therewith, and not on a comparison of the expert's title or specialty with that of the defendant or a competing expert."); *Whiting v. Boston Edison Co.,* 891 F.Supp. 12, 24 (D.Mass.1995) ("Just as a lawyer is not by general education and experience qualified to give an expert opinion on every subject of the law, so too a scientist or medical doctor is not presumed to have expert knowledge about every conceivable scientific principle or disease."); *O'Conner v. Commonwealth Edison Co.,* 807 F.Supp. 1376, 1390 (C.D.Ill.1992) ("[N]o medical doctor is automatically an expert in every medical issue merely because he or she has graduated from medical school or has achieved certification in a medical specialty."), *aff'd,* 13 F.3d 1090 (7th Cir.1994), *cert. denied,* —— U.S. ——, 114 S.Ct. 2711, 129 L.Ed.2d 838 (1994).

Moreover, a number of other states have reached similar results in cases governed by similar evidentiary rules. *See Levesque v. Regional Medical Center Bd.,* 612 So.2d 445, 449 (Ala.1993) (An obstetrician without knowledge of the causes of a condition could not testify regarding causation.); *Hall v. Hilbun,* 466 So.2d 856, 875 (Miss.1985) ("Our trial judges are admonished to ascertain that the witness really is an expert in the particular field at issue. Not every M.D. is a qualified expert in every malpractice case."); *Mankoski v. Briley,* 137 N.H. 308, 627 A.2d 578, 581 (1993); *Gilman v. Choi,* 185 W.Va. 177, 406 S.E.2d 200, 204 (1990)("[I]t is clear that a medical expert may not testify about any medical subject without limitation. . . .").

■ Our holding does not mean that only a neurosurgeon can testify about the cause in fact of death from an injury to the brain, or even that an emergency room physician could never so testify. What is required is that the offering party establish that the expert has "knowledge, skill, experience, training, or education" regarding the specific issue before the court which would qualify the expert to give an opinion on that particular subject. *See, e.g., Ponder v. Texarkana Memorial Hosp.,* 840 S.W.2d 476, 477–78

(Tex.App.—Houston [14th Dist.] 1991, writ denied) (non-physician with a doctorate in neuroscience, who conducts research on the causes of neurological injuries and teaches neurophysiology, neuroanatomy and neurochemistry to M.D.s and Ph.D.s, may qualify as a medical expert on the cause of brain damage); *Bilderback v. Priestley*, 709 S.W.2d 736, 741 (Tex.App.—San Antonio 1986, writ ref'd n.r.e.) (In a trial against a medical doctor who prescribed physical therapy, a non-physician professor of biophysics who taught physical therapy students could testify about "the mechanics, forces and effects of weights used in administering physical therapy."). And when a party can show that a subject is substantially developed in more than one field, testimony can come from a qualified expert in any of those fields. *Porter v. Puryear*, 153 Tex. 82, 262 S.W.2d 933, 936 (1953). *See also Hersh v. Hendley*, 626 S.W.2d 151, 154–55 (Tex.App.—Fort Worth 1981, no writ) (Orthopedic surgeon could testify in suit against podiatrist on the standard of care for podiatric surgery since it "was common throughout the medical profession.").

On this record, however, the trial court did not abuse its discretion by excluding Dr. Condo's testimony on the cause of Heise's death. Therefore, we reverse the judgment of the court of appeals and render judgment that plaintiffs take nothing.