**Lela CLARK, Appellant,**

v.

**HCA, INC. d/b/a Del Sol Rehabilitation Hospital, El Paso Health Care Systems, Ltd. d/b/a/ Del Sol Rehabilitation Hospital, Del Sol Rehabilitation Hospital, Robert Moreno, M.D., and Mariano Palacios, M.D., Appellees.**

No. 08–04–00291–CV.

Court of Appeals of Texas,
El Paso.

Aug. 25, 2005.

Michael Cohen, Law Office of Michael Cohen, El Paso, for Appellant.

Frank Feuille IV, Scott, Hulse, Marshall, Feuille, Finger & Thurmond, P.C., Larry W. Hicks, Hadley A. Huchton, Hicks & Lucky, P.C., El Paso, for Appellees.

Before BARAJAS, C.J., McCLURE, and CHEW, JJ.

## OPINION

DAVID WELLINGTON CHEW, Justice.

Lela Clark appeals the dismissal of her medical malpractice suit against Dr. Robert Moreno, Dr. Mariano Palacios, and Del Sol Rehabilitation Hospital (Del Sol). At issue are the qualifications of the expert witness and the adequacy of his report. Finding no abuse of discretion, we affirm.

## FACTUAL SUMMARY

The following discussion is taken from the narrative contained within the expert report at issue. On or about May 7, 2003, Clark was evaluated at Del Sol Medical Center Emergency Department for chest pain, cardiac problems, nausea, and stomach pain. She was subsequently admitted to the Inpatient Rehabilitative Program at Del Sol Rehabilitation Hospital. Physicians verbal orders prescribed the twice daily 66 mg subcutaneous administration of Lovenox, an anticoagulant often used for deep venous thrombosis (DVT) prophylaxis in patients at risk. Lovenox is contraindicated for elderly patients with hypertension and renal insufficiency. Clark was 79 years old, suffered from hypertension, and was post-nephrectomy as a result of renal cancer.

On May 13, Clark had bruising in her abdominal area and large palpable lumps allegedly caused by the Lovenox. On May 17, she complained about pain in her right arm, and a bump was discovered in front of her right elbow. A vascular Doppler ultrasound of the right arm was negative for DVT, but a large amount of fluid was found in the right antecubital fossa.

On May 19, Clark was transferred to the acute care facility at Del Sol Medical Center under the supervision of Dr. Enrique Porras. The discharge summary from the rehabilitation facility indicated that the patient developed compartment syndrome.... Dr. Porras noted that Clark had a significant amount of pain and decreased range of motion. He diagnosed a hematoma of the right arm and hypertensive crisis due to pain and anxiety. His recommendation was to administer Vitamin K on a daily basis for three days, to continue the Lovenox, and to apply heat packs to the swelling. On May 20, a CT scan was consistent with the clinical suspicion of a hematoma.

On May 21, Dr. Maria Angelina Halsted evaluated Clark and suspected an infected hematoma. She noted that Clark was unable to extend her right arm, but there was no motor deficit in the right hand. Dr. Halstead recommended incision and drainage with decompression to ensure that Clark had not developed compartment syndrome. This procedure was performed the next day and revealed a large hematoma but no evidence of compartment syndrome ... with complete function of the hand and muscle on inspection. Clark was discharged on May 29, 2003. There was no mention of her range of motion upon discharge.

## THE PLEADINGS

On August 29, 2003, Clark sued HCA, El Paso Healthcare Systems, Del Sol Rehabilitation Hospital, Dr. Moreno, and Dr. Palacios on a medical malpractice claim. The basis of the suit against all defendants was pled in the following particulars:

HCA and El Paso Healthcare Systems own and operate Del Sol. The nurses and staff at Del Sol had a duty [to] monitor the status of Plaintiff for indications of an adverse reaction to the medications being administered by them. They had a further duty to administer all medications properly as instructed by the treating physicians. Dr. Moreno and Dr. Palacios had a duty to properly assess Plaintiff, to properly review the medical history of Plaintiff and properly prescribe medications that are not contraindicated for a patient with Plaintiff's history. As a result of the failures of the nursing staff of Del Sol, and most particularly, because of the failure of Dr. Moreno and Dr. Palacios to properly assess Plaintiff's medical history and properly prescribe medications, Plaintiff was forced to endure a painful condition which required subsequent painful surgery and is left with an 80%–90% paralysis of her right hand. Plaintiff has lost all independence and has been forced to remain in a long term care facility in order to receive appropriate care.

Clark timely filed an expert report and *curriculum vitae* from Dr. Elmer Pacheco. Dr. Pacheco reviewed the medical care provided to Clark at Del Sol Medical Center and Del Sol Rehabilitation Hospital in rendering his opinion.

On May 24, 2004, Dr. Palacios filed a motion challenging the adequacy of the expert report and seeking dismissal of the claim. He argued that the report did not demonstrate that Dr. Pacheco was qualified to render an expert opinion. He also alleged that the report did not (1) support the plaintiff's allegations, (2) set out the standard of care applicable to him or how he breached it, or (3) explain how the breach caused Clark's injury. On May 25, Dr. Moreno also filed a motion challenging the adequacy of the expert report and

seeking dismissal on the same grounds. Del Sol filed its motion on July 19.

Clark filed a response supported by her attorney's affidavit. Counsel explained that he believed Dr. Pacheco was qualified to render an opinion because he was a board certified internist. In his view, Pacheco properly discussed the standards of care, the standards breached, the results of the breach, and damages. Counsel thus believed that the report met the requirements of the Act but opined that if it did not, then it was the result of accident or mistake. He then sought a thirty-day grace period in which to file an amended report. The trial court granted the motions challenging the report and dismissed the suit with prejudice.

### THE MEDICAL LIABILITY AND INSURANCE IMPROVEMENT ACT

The Medical Liability and Insurance Improvement Act (the Act) was enacted by the Texas Legislature to curtail frivolous claims. *Hart v. Wright*, 16 S.W.3d 872, 876 (Tex.App.-Fort Worth 2000, pet. denied); *Horsley–Layman v. Angeles*, 968 S.W.2d 533, 537 (Tex.App.-Texarkana 1998, no pet.). In order to encourage the screening of medical malpractice claims by an expert prior to filing, the Act requires a plaintiff to provide each defending physician or health care provider with one or more expert reports relating to liability and causation. *Wood v. Tice*, 988 S.W.2d 829, 830 (Tex.App.-San Antonio 1999, pet. denied); *see* Act of May 1, 1995, 74th Leg., R.S., ch. 140, § 1, sec. 13.01(d), 1995 Tex.Gen.Laws 985, 987 (repealed 2003). The expert report, along with a *curriculum vitae* of each expert, must be furnished to the defendant not later than the 180th day after the date on which a health care liability claim is filed or the last day of any extended period as

permitted under the statute. *Id.* Where an expert report is tendered, the defendant may challenge the adequacy of the report via a motion to dismiss. *Id.* § 13.01(*l*); *Hart*, 16 S.W.3d at 876. A report authored by a person who is not qualified to testify cannot constitute an adequate report. *In re Samonte*, 163 S.W.3d 229 (Tex.App.-El Paso 2005, orig. proceeding). A challenge to the adequacy of a report may be based on a claim that it fails to demonstrate the person rendering the opinion is qualified to testify, as well as on other claims of its inadequacy. *Id.*

■■ The trial court must grant the motion only if it appears to the court, after hearing, that the report does not represent a good faith effort to comply with the definition of an expert report. *See* Act of May 1, 1995, 74th Leg., R.S., ch. 140, § 1, sec. 13.01(*l*), 1995 Tex.Gen.Laws 985, 987 (repealed 2003); *American Transitional Care Centers of Texas, Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex.2001). An expert report is defined as a fair summary of the expert's opinions regarding: (1) applicable standards of care, (2) the manner in which the care rendered by the physician or health care provider failed to meet the standards, and (3) the causal relationship between that failure and the injury, harm, or damages claimed. *Id.* § 13.01(r)(6). In determining whether the report represents a good faith effort, the trial court's inquiry is limited to the four corners of the report. *See* Act of May 1, 1995, 74th Leg., R.S., ch. 140, § 1, sec. 13.01(r)(6), 1995 Tex.Gen. Laws 985, 987 (repealed 2003); *Palacios*, 46 S.W.3d at 878. To constitute a good faith effort, the report must: (1) inform the defendant of the specific conduct the plaintiff has called into question, and (2) it must provide a basis for the trial court to conclude that the claims have merit. *Palacios*, 46 S.W.3d at 879. To inform the defendant of the specific conduct the plain-

tiff has called into question, the report must support the cause of action alleged by the plaintiff in her pleadings. *Windsor v. Maxwell*, 121 S.W.3d 42, 50 (Tex.App.-Fort Worth 2003, pet. denied).

■ The report need not marshal all of the plaintiff's proof, but it must include the expert's opinion on each of the three elements identified by the Act: standard of care, breach, and causal relationship. A report cannot merely state the expert's conclusions about these elements. Rather, the expert must explain the basis of his statements to link his conclusions to the facts. *Id.* Likewise, a report that omits any of the statutory requirements does not constitute a good faith effort. *Palacios*, 46 S.W.3d at 879.

### STANDARD OF REVIEW

We review a trial court's dismissal under former Article 4590i, section 13.01(r)(6) under an abuse of discretion standard. *American Transitional Care Centers of Texas, Inc. v. Palacios*, 46 S.W.3d 873, 877 (Tex.2001). Under this standard, we determine whether the trial court acted arbitrarily and without reference to any guiding rules or principles when it struck Clark's expert report and dismissed her case. *Walker v. Gutierrez*, 111 S.W.3d 56, 62 (Tex.2003). We may not reverse a trial court's discretionary ruling simply because we might have decided it differently. *Id.*

### EXPERT QUALIFICATIONS

In Point of Error One, Clark contends that Dr. Pacheco was qualified to render an opinion on the standard of care. Several courts of appeals have recognized that to comply with Section 13.01(d) and (r)(6), the expert report must establish, on its face, that the purported expert is qualified. *See Estate of Allen v. Polly Ryon Hospital Authority*, No. 01-04-00151-CV, 2005 WL 497291 at *3 (Tex.App.-Houston [1st Dist.] March 3, 2005, no pet. h.)(not reported);

*Hansen v. Starr,* 123 S.W.3d 13, 20 (Tex. App.-Dallas 2003, pet. denied); *Chisholm v. Maron,* 63 S.W.3d 903, 907 (Tex.App.-Amarillo 2001, no pet.); *Schorp v. Baptist Memorial Health System,* 5 S.W.3d 727, 732 (Tex.App.-San Antonio 1999, no pet.).

■ Former Article 4590i, section 14.01 sets out the requirements for an expert witness in a suit against a physician. A person may qualify as an expert witness on the issue of whether the physician departed from accepted standards of medical care only if the person is a physician who: (1) is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose; (2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care. *See* Act of May 1, 1995, 74th Leg., R.S., ch. 140, § 2, sec. 14.01(a), 1995 Tex.Gen.Laws 985, 988 (repealed 2003). The report itself must establish the expert's qualifications on the basis of training and experience. *See In re Windisch,* 138 S.W.3d 507, 511 (Tex.App.-Amarillo 2004, orig. proceeding).

■ In determining if an expert is qualified on the basis of training and experience, the court is to consider whether, at the time the claim arose or the testimony is given, the witness is board certified or has other substantial training or experience in an area of practice relevant to the claim and is actively practicing medicine in rendering medical care services relevant to the claim. *See* Act of May 1, 1995, 74th Leg., R.S., ch. 140, § 2, sec. 14.01(c), 1995 Tex.Gen.Laws 985, 988 (repealed 2003). Because of the increasing specialization of medicine, there is no validity, if there ever was, to the notion that every licensed medical doctor should be automatically qualified to testify as an expert on every medi-

cal question.... [T]he proponent of the testimony has the burden to show that the expert 'possess[es] special knowledge as to the very matter on which he proposes to give an opinion.' *Broders v. Heise,* 924 S.W.2d 148, 152–53 (Tex.1996). Thus, the issue is the specific subject matter and the expert's familiarity with it. *Broders,* 924 S.W.2d at 153.

■ Dr. Pacheco's *curriculum vitae* (CV) reveals that he is board certified in internal medicine, oncology, and nuclear medicine. He completed an internal medicine internship and residency at University District Hospital, Medical Sciences Campus in Rio Pierdas, Puerto Rico from 1981 until 1984. He was on active duty with the United States Army Medical Corps from 1984 until 1988. Between 1988 and 1990, he pursued a medical oncology fellowship at M.D. Anderson Cancer Center in Houston. His nuclear medicine fellowship was obtained at William Beaumont Army Medical Center in El Paso from 1992 until 1994. He remained at Fort Bliss in El Paso until 1996, serving as teaching staff and a staff physician in nuclear medicine and hematology-oncology. He then launched his private practice. His CV indicates he practiced as a physician in Laredo and El Paso, Texas; Sioux Falls, South Dakota; Wausau and Sheboygan, Wisconsin; Grand Junction, Colorado, and Thomasville, Georgia. Most recently he was employed as a [p]hysician with Pacific Coast Hematology/Oncology. All of the Appellees allege that at the time of Clark's treatment, Dr. Pacheco was engaged in the practice of oncology. Clark has not professed otherwise.

The expert report makes no mention of Dr. Pacheco's training, experience, or familiarity with Lovenox, anticoagulant medications, deep venous thrombosis, diagnosis and treatment of compartment syndrome, or the causes and results of hematoma. Dr. Pacheco merely quotes a few medical

reference materials with no supporting information concerning the qualifications or expertise of the authors. We are left then with his CV. Dr. Pacheco's specialty in hematology may well qualify him to render an opinion, but the record is silent as to his current role as a hematologist or his experience with anticoagulation therapy. While the CV lists a one-year membership on the Pharmacy Utilization Committee at Archbold Memorial Hospital in Thomasville, Georgia, the record does not establish his awareness of the common usage of Lovenox, contraindications of its usage, or whether he is familiar with the treatment required in the event of an adverse reaction. *See Broders*, 924 S.W.2d at 153. Because we cannot conclude that the trial court abused its discretion in finding that Dr. Pacheco was not qualified to testify as an expert, we overrule Point of Error One.

## ADEQUACY OF THE REPORT

In Point of Error Two, Clark complains that the trial court erred in finding that the expert report was inadequate. In their motions challenging the expert report, Appellees argued that the report did not properly set out the standard of care, breach, or causation.

### *The Report*

■ Dr. Pacheco reviewed the medical records from Del Sol Rehabilitation Hospital from May 7 until May 19 and the records from Del Sol Medical Center from May 19 until May 29. We have already detailed his narrative of events in our factual summary. After narrating this sequence of events, Dr. Pacheco turned to the standard of care. Rather than stating his personal knowledge of the applicable standard of care, he set out nine text boxes containing excerpts from different publications. Because of the unusual format, we quote it verbatim:

## STANDARD OF CARE

A recently published Hospital Medicine Consensus Reports issued a consensus panel statement on the 'Prophylaxis of Venous Thromboembolism (VTE) in the Hospitalized Medical Patient.' It states that all medical inpatients should be screened and considered for VTE prophylaxis. Subsequently, there follows a risk factor assessment based on whether the patient has restricted mobility AND at least one VTE risk factor (such as age greater than 40, heart failure, chronic lung disease). If these criteria are met then pharmacologic prophylaxis for VTE is indicated provided there are no exclusion criteria for such. Possible exclusion criteria include uncontrolled hypertension, significant renal insufficiency (creatinine clearance < 30 ml/minute), among others. If the patient is a candidate for prophylaxis the recommended enoxaparin (Lovenox®) dosage is 40 mg SQ once daily.

Melde SL. Enoxaparin-induced retroperitoneal hematoma. Ann Pharmacother 2003; 37(6): 822-4

Alford et al reported on the occurrence of a '...a compartment syndrome caused by a hematoma which resulted from noninvasive blood pressure monitoring during thrombolytic therapy...'

Alford JW, Palumbo MA, Barnum MJ. Compartment syndrome of the arm: a complication of noninvasive blood pressure monitoring during thrombolytic therapy for myocardial infarction. J Clin Monit Comput 2002. 17 (3-4):13-6

---

On the diagnosis of compartment syndrome of the upper extremity, Seiler et al commented that '...careful attention to the details of the history and physical examination can assist in the development of a usaeful working diagnosis. Testing ITPs (Intracompartmental Pressure) is the best method available to help confirm the diagnosis...'

Seilar JG, Casey PJ, Binford SH. Compartment syndromes of the upper extremity. J South Orthop Association 2000 Winter. 9(4):233-47

---

'...Accute compartment syndrome can have disastrous consequences... unusual pain may be the only symptom of an impending problem...after 8 hrs, the damage (to the muscle) is irreversible ...fasciotomy generally should be done when tissue pressure rises past 20 mmHg below diastolic pressure...'

Whitesides TE, Heckman MM. Acute compartment syndrome: Update on Diagnosis and Treatment. J AM Acad Orthop Surg 1996; 4(4):209-218

---

Kam et al "Evaluated the accuracy of commonly accessed medical textbooks in their description of the presenting sign/symptoms of acute compartment syndrome... (and found that) ... there are only three (symptoms) pain, paresthesia, paresis which are important...

Kam JL, Hu M, Peiler LL, Yamamoto LG. Acute compartment syndrome signs and symptoms described in medical textbooks. Hawaii Med J 2003; 62(7):142-4

---

'...High clinical suspicion is of paramount importance in evaluating the hand or wrist for an evolving compartment syndrome. A detailed history coupled with a thorough physical examination form the basis for the diagnosis. The use of techniques to measure compartment pressures forms the objective foundation to assist in formulating the correct treatment plan... great fault can be assigned to the clinician who chooses to ignore an evolving compartment syndrome that unnecessarily places the patient at risk of permanent disability. Here, the cosmetic benefit of avoiding the fasciotomy is overwhelmed by the often-devastating dysfunction created by ischemic damage to the contents of the affected compartments...'

Ortiz JA, Berger RA. Compartment syndrome of the hand and wrist. Hand Clin 1998;14(3):405-18

The creatinine clearance (on 5/8/03) in this case can be calculated in several ways (patient age 79, serum creatinine 1.5 mg/dL, weight 55.3 kg, height 172 cm, and BSA 1.65m$^2$:

1. Using the Cockcroft and Gault equation (Nephron 1976;16(1):31-41): 26.4 ml/min

2. Sanaka

## CAUSAL RELATIONSHIP BETWEEN FAILURE TO MEET STANDARD OF CARE AND INJURY, HARM, OR DAMAGES CLAIMED

As of the date of this report, and my review of the above described records, it is my opinion that Del Sol Rehabilitation Hospital, Robert Moreno, M.D. and Mariano Palacios, M.D. failed to meet the above described standards of care by failing to properly assess, monitor and timely treat the complications which developed as a result of the improper use of Lovenox. By failing to meet the standard of care, based on a reasonable medical probability, the development of the acute, compartment syndrome created the 'devastating dysfunction created by ischemic damage' causing the complete loss of use of Lela Clark's right arm.

### *Standard of Care*

■ Identifying the standard of care is critical: Whether a defendant breached his or her duty to a patient cannot be determined absent *specific information* about what the defendant should have done differently. *Palacios,* 46 S.W.3d at 880. Dr. Pacheco's report quoted several sources that all inpatients should be screened and considered for venous thromboembolism prophylaxis based on a risk factor assessment. If pharmacologic prophylaxis is indicated, Lovenox (enoxaparin) should be given unless other exclusion criteria apply. He then referenced five articles in which compartment syndrome was discussed. At no point did he indicate that he was personally familiar with the standard of care or that the authors of the various articles had sufficient expertise.

### *Breach of the Standard of Care*

■ Dr. Pacheco opined that the standard of care was breached by Dr. Moreno, Dr. Palacios, and Del Sol since they failed to properly assess, monitor, and timely treat the complications which developed as a result of the improper use of Lovenox. A physician verbally ordered administration of 66 mg of Lovenox twice daily, and Clark's home medications for hypertension were also continued. Dr. Pacheco did not specify which physician ordered the administration of the Lovenox. He did note that Dr. Porras continued the Lovenox even after Clark was transferred from Appellees' care. Clark arguably met the exclusion criteria for use of Lovenox since she was 79 and suffered from congestive heart failure, hypertension, and renal disease. But Dr. Pacheco did not state that the defendants failed to properly recognize the risk factors for venous thromboembolism or the exclusion criteria for use of Lovenox. He did not address whether Lovenox was administered due to an indication of pharmacologic prophylaxis for venous thromboembolism. He didn't even say that Lovenox was contraindicated; he merely asserted that Clark met the exclusion criteria. There was no discussion of risk vs. benefit. Instead, Dr. Pacheco focused on the symptoms of compartment syndrome although the medical records were unclear as to whether Clark actually suffered from compartment syndrome. And he concluded, without detailing the factual basis for his conclusion, that Clark

indeed had compartment syndrome. Finally, Dr. Pacheco failed to state what each of the defendants should have done differently.

### *Causation*

The report also fails to adequately address causation, primarily because of a large analytical gap. Stated simply, Dr. Pacheco opined that Appellees failed to treat the complications resulting from the improper use of Lovenox. He then jumped to the conclusion that the acute, compartment syndrome created the 'devasting dysfunction created by ischemic damage' causing the complete loss of use of Lela Clark's right arm. The missing link is not that compartment syndrome caused devastating dysfunction. The missing link is that the improper use of Lovenox caused compartment syndrome. We conclude that Dr. Pacheco's expert report was inadequate. Point of Error Two is overruled.

### GOOD FAITH EFFORT

In Point of Error Three, Clark complains that the trial court erred in finding that the report was not a good faith effort to comply with the requirements of Article 4590i. To constitute a good-faith effort, an expert report must discuss the standard of care, breach, and causation with sufficient specificity to inform the defendant of the conduct the plaintiff has called into question and to provide a basis for the trial court to conclude that the claims have merit. *Palacios*, 46 S.W.3d at 875. To inform the defendant of the specific conduct the plaintiff has called into question, the report must support the cause of action alleged in the plaintiff's petition. *Windsor*, 121 S.W.3d at 50. When the expert report's conclusory statements do not put the defendant or the trial court on notice of the conduct complained of, the trial court no discretion but to find that the report does not represent a good faith effort. *Palacios*, 46 S.W.3d at 880. Since the report did not discuss the standard of care and breach with sufficient specificity, it cannot constitute a good faith effort. *See Palacios*, 46 S.W.3d at 875. Moreover, the report does not support the cause of action Clark alleged in her pleadings. She alleged that Appellees breached the standard of care by failing to properly assess Plaintiff's medical history and properly prescribe medications. In other words, the standard of care was breached by the administration of Lovenox. Dr. Pacheco, on the other hand, opined that the standard of care was breached by failing to properly assess, monitor and timely treat the complications . . . of Lovenox.

Since the report did not represent a good faith effort to comply with the statutory requirements, the trial court has no discretion but to dismiss Clark's claim with prejudice. *See Palacios*, 46 S.W.3d at 880. We overrule Point of Error Three and affirm the judgment of the trial court.

McCLURE, J., not participating.