In The



Court of Appeals



Ninth District of Texas at Beaumont


____________________



NO. 09-07-372 CV


____________________



KESHAVA REDDY, INFECTIOUS DISEASES ASSOCIATES, L.L.P., 


AND KANDASAMI SENTHILKUMAR, Appellants



V.



WILSON SEALE, JR., INDIVIDUALLY AND AS HEIR AND


REPRESENTATIVE OF THE ESTATE OF MELODY SEALE,


WHITNEY SEALE AND BRIAN C. HOLCOMB, BOTH INDIVIDUALLY


AND AS HEIRS OF THE ESTATE OF MELODY SEALE, AND


LAVERNE GAINES HOWARD, Appellees






On Appeal from the 60th District Court


Jefferson County, Texas


Trial Cause No. B-178,259






 MEMORANDUM OPINION


 In this appeal, we review an order by the trial court denying the defendants' motion
that challenged the sufficiency of the plaintiffs' expert reports in a medical malpractice case. 
See Tex. Civ. Prac. & Rem. Code Ann. § 74.351(l) (Vernon Supp. 2007). Wilson Seale,
Jr., Individually and as Heir and Representative of the Estate of Melody Seale, Whitney Seale
and Brian C. Holcomb, both Individually and as Heirs of the Estate of Melody Seale, and
Laverne Gaines Howard (collectively referred to as "Plaintiffs"), sued Keshava Reddy,
Infectious Diseases Associates, L.L.P., and Kandasami Senthilkumar (collectively referred
to as the "health care providers") on medical malpractice claims and subsequently served
them with expert reports. The health care providers contend the trial court erred in denying
their challenge to Plaintiffs' reports, and present three issues for our review. We affirm the
trial court's order.

Background

 Plaintiffs sued Dr. Reddy (an infectious disease physician), Infectious Diseases
Associates (Dr. Reddy's alleged employer), and Dr. Senthilkumar (a neurologist), and
contend that the physicians committed medical malpractice when treating Melody Seale. 
Plaintiffs claimed that Dr. Reddy and Dr. Senthilkumar misdiagnosed Melody's condition,
which they contend was caused by an atrial myxoma. Plaintiffs alleged that as a result of the
misdiagnosis, Melody did not undergo a surgery that would have prevented her death.

 Plaintiffs served the health care providers with the expert reports of Dr. Brobson Lutz,
an infectious disease specialist and board-certified internist, and Dr. David Korn, a board-certified cardiologist and internist. In their joint motion to dismiss, the health care providers
challenged the adequacy of both Dr. Lutz's and Dr. Korn's reports. See id. Specifically, the
health care providers challenged the experts' qualifications and alleged that the reports fail
to properly set forth the applicable standards of care and to adequately explain causation.

 After a hearing, the trial court entered an order denying the health care providers'
motion to dismiss. The health care providers then filed this interlocutory appeal. See id. §
51.014(a)(9) (Vernon Supp. 2007).


Standards Pertinent to Health Care Liability Expert Reports

 We review a trial court's decision regarding the adequacy of health care liability
expert reports under an abuse of discretion standard. Am. Transitional Care Ctrs. of Tex.,
Inc. v. Palacios, 46 S.W.3d 873, 877-78 (Tex. 2001). A trial court abuses its discretion if it
fails to analyze or apply the law correctly. Walker v. Packer, 827 S.W.2d 833, 840 (Tex.
1992).

 A plaintiff asserting a health care claim must timely provide each defendant health
care provider with an expert report. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a)
(Vernon Supp. 2007). The statute defines "expert report" as follows:

 a written report by an expert that provides a fair summary of the
expert's opinions as of the date of the report regarding
applicable standards of care, the manner in which the care
rendered by the physician or health care provider failed to meet
the standards, and the causal relationship between that failure
and the injury, harm, or damages claimed.

 

Id. § 74.351(r)(6) (Vernon Supp. 2007). If a plaintiff timely furnishes the required report,
the defendants may file a motion challenging the report's adequacy. See id. § 74.351(l).

 The statute provides that the trial court "shall grant a motion challenging the adequacy
of an expert report only if it appears to the court, after hearing, that the report does not
represent an objective good faith effort to comply with the definition of an expert report in
Subsection (r)(6)." Id. When determining whether the report represents a good faith effort,
the trial court's inquiry is limited to the four corners of the report. Bowie Mem'l Hosp. v.
Wright, 79 S.W.3d 48, 52 (Tex. 2002); Palacios, 46 S.W.3d at 878. To constitute a good
faith effort, the report "must discuss the standard of care, breach, and causation with
sufficient specificity to inform the defendant of the conduct the plaintiff has called into
question and to provide a basis for the trial court to conclude that the claims have merit." 
Palacios, 46 S.W.3d at 875.

 A sufficient expert report in a health care liability claim is not required to marshal and
present all of the plaintiff's proof; but the report cannot merely state the expert's conclusions
about the required elements. Wright, 79 S.W.3d at 52. Rather, the report must explain the
basis of the expert's statements to link the expert's conclusions to the facts. Id. At the same
time, the information in the report does not have to meet the same requirements as evidence
offered in a summary judgment proceeding or at trial. Palacios, 46 S.W.3d at 879.

 A person may qualify as an expert witness on the issue of whether a physician
departed from standards of medical care only if the person is a physician who (1) is
practicing medicine at the time such testimony is given or was practicing medicine at the time
the claim arose; (2) has knowledge of accepted standards of medical care for the diagnosis,
care, or treatment of the illness, injury, or condition involved in the claim; and (3) is qualified
on the basis of training or experience to offer an expert opinion regarding those accepted
standards of medical care. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(5)(A) (Vernon
Supp. 2007); § 74.401(a) (Vernon 2005). "In determining whether a witness is qualified on
the basis of training or experience, the court shall consider whether, at the time the claim
arose or at the time the testimony is given, the witness: (1) is board certified or has other
substantial training or experience in an area of medical practice relevant to the claim; and (2)
is actively practicing medicine in rendering medical care services relevant to the claim." Id.
§ 74.401(c) (Vernon 2005).

 Under the Texas Rules of Evidence, an expert must have knowledge, skill, experience,
training, or education regarding the specific issue before the court to qualify as an expert on
the specific issue in question. Broders v. Heise, 924 S.W.2d 148, 153 (Tex. 1996); see also
Tex. R. Evid. 702. For health care liability claims against physicians, with respect to an
expert's opinion testimony on causation, the expert must be a physician, and "otherwise
qualified to render opinions on such causal relationship under the Texas Rules of Evidence." 
Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(5)(C) (Vernon Supp. 2007). 

 In this case, the health care providers contend the trial court abused its discretion in
denying their joint motion to dismiss because Plaintiffs' expert reports are each deficient. 
The health care providers contend that (1) the experts are not qualified to offer the opinions
contained in the reports, (2) each report does not sufficiently set forth the standards of care
and their breaches, and (3) each report fails to provide a fair summary of the causal
relationship between their alleged negligence and Melody's death. We separately address
each report and the qualifications of the report's author under the standards required by the
Texas Civil Practice and Remedies Code.

Adequacy of Dr. Lutz's Report as to Dr. Reddy's Care

 Dr. Reddy first contends that Dr. Lutz is not qualified to offer an expert opinion on 
causation. Specifically, Dr. Reddy claims that Dr. Lutz is an infectious disease specialist
rather than a physician qualified in the areas of cardiac surgery or neurology. Dr. Reddy
contends that as an infectious disease specialist, Dr. Lutz was not qualified to form the
opinion that Melody's death would probably have been prevented had she undergone surgery
to remove her alleged atrial myxoma.

 With respect to Dr. Reddy's challenge that Dr. Lutz is not a cardiologist or
neurologist, we observe that not every physician automatically qualifies as an expert in every
area of medicine. See Broders, 924 S.W.2d at 152. However, a physician need not be a
practitioner in the same speciality as a defendant to necessarily qualify the physician as an
expert in a particular case. See id. at 153; see also Blan v. Ali, 7 S.W.3d 741, 745 (Tex.
App.-Houston [14th Dist.] 1999, no pet.). Under the Rules of Evidence, the test is whether
the offering party has established that the expert has knowledge, skill, experience, training,
or education on the specific issue before the court. See Tex. R. Evid. 702; Broders, 924
S.W.2d at 153; see also Roberts v. Williamson, 111 S.W.3d 113, 121 (Tex. 2003). 

 Dr. Lutz has practiced medicine as a board-certified internist and infectious disease
specialist since 1978. Dr. Lutz stated that he has assisted in the diagnosis and treatment of
several persons with newly diagnosed atrial myxomas. Additionally, he has diagnosed and
treated dozens of patients with central nervous system infections of multiple viral and
bacterial etiologies. Melody's treating physicians believed that Melody's condition was
related to a central nervous system infection. Dr. Lutz added that he is often called as a
consulting infectious disease specialist in order to pinpoint the specific pathogen or condition
causing a patient's symptoms, which involves not only the diagnostic evaluation of infectious
processes but also those that mimic infectious processes, such as atrial myxomas. In his
report, Dr. Lutz presented the opinion that "[m]ost patients who have timely surgery to
remove atrial myxomas have excellent outcomes."

 Dr. Lutz based his opinion on his review of Melody's extensive medical records. 
Because Dr. Lutz's qualifications reflect that he has prior experience in the diagnosis and
treatment of persons with atrial myxomas, we find the trial court did not abuse its discretion
in accepting Dr. Lutz's qualifications as sufficient to allow him to offer an opinion
concerning the potential that Melody would benefit from heart surgery. See Tex. R. Evid.
702; Broders, 924 S.W.2d at 153.

 Next, Dr. Reddy asserts that Dr. Lutz's report lacks a sufficient factual basis to
support an opinion that Dr. Reddy breached a standard of care. In his report, Dr. Lutz lists
Melody's symptoms upon her admission to the hospital. While Melody presented with some
symptoms that would include an initial differential diagnosis of meningitis, Dr. Lutz opined
that certain of Melody's test results required that Dr. Reddy consider a diagnosis of an atrial
myxoma. (1) Additionally, Dr. Lutz commented in his report that Melody had multiple risk
factors for coronary artery disease. Last, Dr. Lutz's report reveals that he reviewed Melody's
echocardiogram, which he indicates supports his opinion that she suffered from an atrial
myxoma.

 Dr. Lutz's report explains that Dr. Reddy's alleged breach of care was his failure to
consider other diagnoses for Melody's condition and take the necessary steps, which Dr. Lutz 
identifies, to rule out an atrial myxoma. Dr. Lutz's report further indicates that as Dr. Reddy
received the test results, which tests are identified in his report, Dr. Reddy should have
recognized that his initial diagnosis was incorrect. Thus, Dr. Lutz's report sets forth
standards of care applicable to Dr. Reddy and identifies what he contends that Dr. Reddy
should have done differently. Accordingly, we conclude that Dr. Lutz's report constitutes
a fair summary of his opinions as it identifies the applicable standards of care, explains how
those standards were breached, and links the reported conclusions to the facts. See Palacios,
46 S.W.3d at 879-880.

 Dr. Reddy also contends that Dr. Lutz's report is inadequate because his statements
as to causation are speculative and conclusory. A report that merely states the expert's
conclusions as to the causation does not satisfy the statutory requirements. Tex. Civ. Prac.
& Rem. Code Ann. § 74.351(r)(6). The expert must explain how the alleged malpractice
caused the injury or death. See Wright, 79 S.W.3d at 53.

 Dr. Lutz's report reflects his opinion that surgery would have saved Melody's life. 
Dr. Lutz's report also states that most patients who have surgery for timely diagnosed atrial
myxomas have excellent results. However, because Melody was never diagnosed with an
atrial myxoma by her treating physicians and because there has been no autopsy, Dr. Reddy
disputes that a physician could diagnose Melody as having suffered from an atrial myxoma. 

 Dr. Reddy relies on Clark v. HCA, Inc., 210 S.W.3d 1 (Tex. App.-El Paso 2005, no
pet.), to support his contention that Dr. Lutz's report is conclusory as to causation. In Clark,
the plaintiff claimed that she suffered complications from taking an anticoagulant that
resulted in a paralysis of her arm. Id. at 4-5. The expert in Clark opined that "[b]y failing
to meet the standard of care, based on a reasonable medical probability, the development of
the acute, compartment syndrome created the 'devastating dysfunction created by ischemic
damage' causing the complete loss of use of [the patient's] right arm." Id. at 10. The court
of appeals affirmed the trial court's decision to dismiss the medical malpractice suit as a
result of a large analytical gap. Id. at 11. The court stated that the link was not that
compartment syndrome can cause devastating dysfunction, but that the expert failed to
explain how the anticoagulant caused the compartment syndrome. Id.

 In the case before us, the trial court did not find the report insufficient, and we also
find that Dr. Lutz's report does not suffer a similar analytical gap. Dr. Lutz's opinion is
premised on the claim that Melody had an atrial myxoma; Dr. Lutz's report reveals that his
opinion on that issue is based upon his review of all of Melody's medical records, which
specifically included the actual echocardiogram performed on Melody just before her death. 
His report explains how surgery to remove the atrial myxoma would have resulted in
Melody's survival. Thus, there is no analytical gap in Dr. Lutz's explanation.Adequacy of Dr. Korn's Report as to Dr. Senthilkumar's Care

 With respect to Plaintiffs' health care liability claims against Dr. Senthilkumar,
Plaintiffs' rely on the report of Dr. Korn. Dr. Senthilkumar contends that Dr. Korn is not
qualified to provide opinions regarding the applicable standards of care in Dr. Senthilkumar's
field of neurology. Dr. Korn, a board-certified cardiologist and internist, states in his report
that he is familiar with the standard of care for neurologists caring for a patient that presents
with symptoms such as Melody's. Dr. Korn's report also states that in his practice as a
cardiologist, he maintains close relationships with neurologists and collaborates with them
as a consulting physician to determine correct diagnoses. According to Dr. Korn, his
experience includes collaborating with physicians in cases of patients suspected of having
atrial myxomas, endocarditis, and meningitis. Dr. Korn's report indicates that patients with
neurologic symptoms can have cardiac conditions; consequently, neurologists are trained, as
are cardiologists and internists, "to evaluate and diagnose patients with signs and symptoms
consistent with an atrial myxoma, as they are often associated with neurological sequella." 
Dr. Korn's report further asserts that the "standards of care for evaluation, care, and initial
treatment of patients presenting with an atrial myxoma are identical" for both neurologists
and cardiologists.

 Dr. Korn's report establishes his credentials as a board certified cardiologist and
internist, and with respect to atrial myxomas, the report is sufficient to allow the trial court
to determine that Dr. Korn was qualified to express an opinion on the standard of care for a
neurologist in diagnosing an atrial myxoma. See Blan, 7 S.W.3d at 745 ("[A] medical
witness who is not of the same school of practice may be qualified to testify if he or she has
practical knowledge of what is usually and customarily done by other practitioners under
circumstances similar to those that confronted the defendant charged with malpractice."). 
We conclude that the trial court did not err in accepting Dr. Korn's qualifications as
sufficient to identify the standard of care to be followed by a neurologist in diagnosing an
atrial myxoma. Tex. Civ. Prac. & Rem. Code Ann. § 74.401(a), (c).

 Dr. Senthilkumar also challenges the adequacy of Dr. Korn's qualification to express
an expert opinion on the causal relationship between Melody's death and Dr. Senthilkumar's
alleged breaches of the applicable standard of care. Dr. Senthilkumar contends that because
Dr. Korn is not qualified in the areas of cardiac surgery or neurology, he cannot provide an
opinion that a different course of treatment would have prevented Melody's death.

 Dr. Korn's report reflects that he is a board-certified cardiologist and internist who
has twenty-six years of experience practicing medicine. He maintains a clinical practice and
serves as a consulting cardiologist. Dr. Korn's report states that he has experience in caring
for patients with presenting symptoms similar to those of Melody. Dr. Korn's report also
states that he knows to include atrial myxomas in the differential diagnosis of a patient with
Melody's signs and symptoms. Dr. Korn's report concludes that "[s]urgical removal is an
effective and necessary treatment for atrial myxomas; and the long-term prognosis for
patients undergoing this procedure is excellent."

 Dr. Korn's opinions were based, in part, on his review of Melody's extensive medical
records. His report reflects that he has experience with patients with signs and symptoms like
Melody's. Because Dr. Korn's qualifications reflect his training and experience in the
diagnosis and treatment of persons with atrial myxomas, we find the trial court did not abuse
its discretion in accepting Dr. Korn's qualifications as sufficient to allow him to identify the
applicable standards of care and how breaches in those standards resulted in Melody's
alleged injury. See Tex. R. Evid. 702; Broders, 924 S.W.2d at 153.

 Dr. Senthilkumar also asserts that Dr. Korn's report lacks a sufficient factual basis to
support Plaintiffs' claims that Dr. Senthilkumar breached the applicable standard of care. 
Dr. Korn's report identifies symptoms that were, in his opinion, relevant to a differential
diagnosis. Dr. Korn explains the results of certain tests administered to Melody and their
significance. Specifically, Dr. Korn's report states that "[i]n light of the results of [the EKG
and chest x-ray], in combination with [Melody's] neurologic symptoms, and history of
hypertension along with other coronary artery disease risk factors," the applicable standard
of care required Dr. Senthilkumar to consider the likely diagnosis of an atrial mass and then
to order that "a prompt echocardiogram be performed to rule out or rule in the atrial
myxoma." Dr. Korn's report also states that Dr. Senthilkumar should have requested a
cardiology consult.

 We conclude that the trial court did not abuse its discretion in deciding that Dr. Korn's
report was factually sufficient to represent a good faith summary. Dr. Korn's report reflects
that he reviewed Melody's medical records, is familiar with the standards of care for this type
of patient, and is familiar with the opinion that would be reached following a differential
diagnosis of a patient with Melody's presentation, regardless of whether that patient were to
be treated by a neurologist or a cardiologist. Dr. Korn's report reflects his opinion that
Melody was not treated for an atrial myxoma, which he opines, should have been diagnosed
in her case. We find no abuse of discretion in the trial court's ruling on Dr. Senthilkumar's
motion to dismiss based on the arguments presented by the health care providers. See
Palacios, 46 S.W.3d at 879-880. 

 Finally, Dr. Senthilkumar contends that Dr. Korn's report is inadequate because the
report does not adequately explain how Dr. Senthilkumar's alleged malpractice caused
Melody's injury or death. Dr. Korn opined that "early intervention for atrial myxomas and
prompt removal is almost always successful[,]" and that if Dr. Senthilkumar had properly
diagnosed Melody's atrial myxoma, it would have been removed and her death prevented. 
Mere conclusions as to the causation will not satisfy the statutory requirements. See Wright,
79 S.W.3d at 53; see also Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6).

 Dr. Senthilkumar contends that Dr. Korn's opinion on causation contains an analytical
gap because Melody was never diagnosed with an atrial myxoma. As a result, he asserts that
Dr. Korn's opinion is conclusory and speculative. Dr. Senthilkumar argues that without a
diagnosed atrial myxoma, Dr. Korn cannot explain how Dr. Senthilkumar breached a
standard of care by not considering it in his differential diagnosis and ruling it out as a
possible explanation for Melody's symptoms. 

 Dr. Senthilkumar's argument assumes that Dr. Korn has insufficient information to
form a medical opinion that Melody had an atrial myxoma. However, Dr. Korn's opinion
is premised on his review of her medical records, including an echocardiogram performed
the day before Melody's death. Based on our review of the record before us, we cannot
locate a report from the treating physician that read the echocardiogram. Thus, it was within
the trial court's discretion to accept Dr. Korn's opinion that Melody suffered from an atrial
myxoma based upon his review of her medical records and tests. We conclude that because
Dr. Korn had sufficient facts to offer an opinion on the presence of an atrial myxoma, he was
in a position to offer his subsequent opinions concerning the care Melody required to treat
her atrial myxoma. Thus, we do not agree that Dr. Korn's report contains the analytical gap
asserted by Dr. Senthilkumar.

Conclusion

 We conclude that the trial court did not abuse its discretion in ruling that the reports
of Dr. Lutz and Dr. Korn met the requirements of expert reports under Texas law. See Tex.
Civ. Prac. & Rem. Code Ann. § 74.351. As a result, the trial court did not abuse its
discretion in denying the health care providers' motion to dismiss. We overrule the issues
they raise in their appeal, and we affirm the trial court's order.

 AFFIRMED.

 ____________________________

 HOLLIS HORTON

 Justice


Submitted on November 29, 2007

Opinion Delivered March 20, 2008

Before Gaultney, Kreger, and Horton, JJ.
1. Both Dr. Reddy and Dr. Senthilkumar argue that Dr. Lutz and Dr. Korn ignored
contradictory medical evidence provided by medical records. Plaintiffs contend that we may
not review these records as our review is limited to the four corners of the expert reports. We
disagree that the information referred to by Dr. Lutz and Dr. Korn in their reports is outside
the scope of our review. Both Dr. Lutz and Dr. Korn state in their respective reports that they
reviewed Melody's medical records; thus, in determining whether their reports represent a
fair summary, the records that they referred to are within our purview. While a court cannot
go outside the expert's report in order to supply information that is statutorily required to be
within it, the challenge by the health care providers in this case addresses whether the
opinions in the expert reports are supported by the medical records that the experts
represented they reviewed. See Bowie Mem'l Hosp. v. Wright, 79 S.W.3d 48, 53 (Tex. 2002)
("[T]he report must include the required information within its four corners."). Having
reviewed the medical records, however, we cannot conclude that the medical records
necessarily preclude the opinions that were reached by Dr. Lutz and Dr. Korn.