In The



Court of Appeals



Ninth District of Texas at Beaumont


____________________



NO. 09-08-299 CV


____________________



JEROME C. YOUNG, MARRA S. FRANCIS, AND


OBSTETRICS AND GYNECOLOGY OF THE WOODLANDS, Appellants



V.



LORI CUNNINGHAM PINTO, Appellee


 




On Appeal from the 9th District Court


Montgomery County, Texas


Trial Cause No. 07-09-09321-CV






MEMORANDUM OPINION



 Appellee Lori Cunningham Pinto sued appellants Jerome C. Young, Marra S. Francis,
and Obstetrics and Gynecology of the Woodlands ("OGW") for alleged medical malpractice. 
Appellants filed objections to Pinto's amended expert report and moved to dismiss Pinto's
claim based upon the report's various alleged inadequacies. See Tex. Civ. Prac. & Rem.
Code Ann. § 74.351(l) (Vernon Supp. 2008). The trial court denied appellants' motion to
dismiss. Appellants then filed this accelerated interlocutory appeal, in which they raise four
issues for our consideration. See Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(9)
(Vernon 2008). We affirm.

Background


 Pinto alleged in her original petition that on July 5, 2005, she underwent a
laparoscopic-assisted hysterectomy performed by Drs. Young and Francis at Memorial
Hermann The Woodlands Hospital. On July 7, 2005, Pinto was discharged. Pinto's petition
also alleged that Young and Francis were employees of OGW. Pinto's petition further
alleged that she was readmitted July 11, 2005, with extreme pain, nausea, and vomiting, and
her physicians determined that her right ureter was obstructed. According to Pinto's petition,
another physician attempted to unblock her right ureter by inserting a wire from the bladder
up toward the kidney, but that procedure was unsuccessful, so "a nephrostomy tube was
inserted into the kidney . . . to allow it to drain." In her petition, Pinto contended that she was
then discharged with "medication for intense pain[,]" and her physicians ultimately
"determined that the ureter had been sewn shut during the laparoscopic assisted hysterectomy
performed by Defendants Young and Francis." Pinto's petition alleged that she ultimately
underwent a successful surgery at Methodist Hospital to break the suture, and that she was
admitted to Methodist Hospital on several other occasions to have her bladder irrigated, to
have the catheter removed from her bladder, and "to have a ureteral stent inserted and the
nephrostomy tube removed."

 Pinto's petition alleged that Drs. Young and Francis were negligent because they:

 (a) fail[ed] to properly inform [Pinto] of the risks associated with a
hysterectomy and to remove blockage from [her] ureter;


 (b) breach[ed] the standard of care in the performance of a hysterectomy;


 (c) breach[ed] the standard of care for treatment of a surgical patient;


 (d) breach[ed] the standard of care for the follow-up treatment of a surgical
patient;


 (e) breach[ed] the standard of care for diagnosing post-surgical
complications of a surgical patient;


 (f) fail[ed] to take precautions to minimize the risk of untimely treatment;
and


 (g) violat[ed] the policies and procedures governing the proper
administration of treating surgical patients.


In addition, Pinto alleged that OGW was liable for the alleged negligence of Drs. Young and
Francis under the doctrine of respondeat superior. With her original petition, Pinto filed a
two-page expert report by Rodney A. Appell, M.D., FACS. See Tex. Civ. Prac. & Rem.
Code Ann. § 74.351 (Vernon Supp. 2008). Appellants filed an objection to Appell's report,
in which they argued that Appell's report did not establish that he is qualified to render
opinions on causation and liability, and that the report (1) failed to sufficiently identify duty,
standard of care, and breach of the standard of care as to each defendant; (2) failed to provide
a sufficient factual basis for Appell's opinions and did not link his conclusions to the facts;
(3) failed to inform each defendant with sufficient specificity of the conduct plaintiff had
called into question; (4) failed to discuss the elements of medical negligence with sufficient
specificity to provide a basis for the trial court to conclude that the claims have merit; and
(5) provided opinions that were "speculative, conclusory, vague, and assume facts."

 The trial court sustained appellants' objections, and Pinto then filed an amended
report by Appell. Appell's amended report alleged as follows, in pertinent part:

 Lori C. Pinto . . . underwent a laparoscopic-assisted hysterectomy and
left salpingo-oophorectomy on July 5, 2005, as performed by Dr. Jerome C.
Young and Dr. Marra S. Francis. Post-operatively she was readmitted on the
5th postoperative day with right flank pain and fever. Her creatinine was 1.1.
She had a CT scan performed, which demonstrated distal right ureteral
obstruction with no obvious stone as a cause but significant right hydroureter. 
An IVP demonstrated obstruction 4cm away from the right ureterovesical
junction with surgical clips noted in the area but about 2cm away from the
distal right ureteral obstruction. Appropriate urological consultation was
obtained and attempted cystoscopy and failed right ureteral catheterization and
stenting took place so that radiology was consulted and a percutaneous
nephrostomy tube was placed without difficulty. Patient defervesed and was
discharged on July 14. Medical tests ruled out a kidney stone, infection,
calcification, and abnormal lab results. The conclusion was that a suture was
obstructing the ureter and this would eventually dissolve and allow the ureter
to become unobstructed again. It is my contention as an expert in the field of
female urology and gynecology that this was very risky with a complete
obstruction of the ureter.

 

 . . . .

 

 The documents reviewed for this report include all medical and surgical
records of Lori Cunningham Pinto relating to the surgery performed on July
5, 2005, and thereafter. The delay in management in this case for over one
month resulted in bringing the patient to Methodist Hospital on August 16 to
attempt to pass a universal stent, which failed. August 24th she then urinated
blood clots and returned to the emergency room, ha[d] her bladder irrigated
and was admitted to the hospital again. August 26th the catheter was removed
from the bladder and she voided more clots and the nephrostomy tube was set
to straight drainage again and she was discharged. She returned to radiology
at Methodist Hospital on September 12, 2005, and under conscious sedation
an 8.5 French double-J ureteral stent was successfully passed from the
nephrostomy site past the obstruction into the bladder and was deployed in the
kidney and [the] nephrostomy was removed. I do not see in the records how
long the stent was left in place and when it was removed and how the renal
unit and obstruction is currently.


 It is my opinion that after the obstruction could not be passed from
below or above in early July and the patient was continuing to have substantial
discomfort a risk was taken to leave the ureter ligated and waiting for the
suture to dissolve when there was no guarantee that the blood supply to the
ureter would not have been compromised resulting in significant risk to the
kidney and a[n] open or laparoscopic repair of the ureter should have been
offered to the patient. The patient was not properly informed of the options to
care for this problem and the patient's renal function on the right side was
compromised with ultimate risk [to] the patient [of] right kidney loss. Simply
waiting for the suture to dissolve over an extended period of time created an
undue risk for the health and safety of the patient.


 The breach of the standard of care by Dr. Young and Dr. Francis was
firstly, ligating the ureter which is not a portion of the surgical technique for
hysterectomy. Having stitched the ureter completely closed during the
performance of a routine hysterectomy falls below the standard of care to be
expected in such a procedure. Had it not been for this act, the patient would
have never had to undergo further medical treatment. The subsequent medical
treatment following the patient's initial hysterectomy was the direct result of
having stitched the ureter closed originally. This breach can then be extended
to the post-operative management of the patient by Dr. Young, Dr. Francis,
and Dr. Hogan, as all forms of management including surgical repair of the
damaged ureter does not seem to have been discussed with the patient. 
Multiple tests had been performed which clearly showed a complete
obstruction of the right ureter. However, the patient was not given the option
of a surgical procedure that would . . . have prevented the multiple subsequent
procedures she underwent resulting in the prolonged discomfort she endured. 
The appropriate standard of care in treating a patient with a complete ureteral
obstruction would be to inform the patient of both invasive and non-invasive
procedures, including procedures that would immediately determine the cause
of the obstruction such as simply opening the area to visual examination. This
option was not given to [the] patient thus breaching the standard of care and
making further medical treatment unnecessary [sic].


 After Appell provided the amended expert report, appellants filed a supplemental
motion to dismiss, in which they incorporated their original objections and also argued that 
Appell's report does not satisfy the requirements of Chapter 74 and Am. Transitional Care
Ctrs. of Tex., Inc. v. Palacios, 46 S.W.3d 873, 875-79 (Tex. 2001); Appell's report "attempts
to impute negligence based on results alone[;]" and Appell was required to serve an expert
report "as to entity defendant" OGW. The trial court denied appellants' objections and
motion to dismiss, and appellants then filed this appeal.

Standard of Review


 We review a trial court's decision regarding the adequacy of an expert report under
an abuse of discretion standard. Palacios, 46 at 877. "A trial court abuses its discretion if
it acts in an arbitrary or unreasonable manner without reference to any guiding rules or
principles." Bowie Mem'l Hosp. v. Wright, 79 S.W.3d 48, 52 (Tex. 2002). A trial court also
abuses its discretion if it fails to analyze or apply the law correctly. Walker v. Packer, 827
S.W.2d 833, 840 (Tex. 1992).



Issue One


 In their first issue, appellants contend that the trial court erred by determining that
Appell is qualified to render liability and causation opinions against appellants. (1) Specifically,
appellants argue that while Appell is an urologist, Young and Francis are gynecologists, and
that because Appell's report states that all of the hysterectomies he performs involve uterine
prolapse, Appell is not qualified to opine regarding Pinto's laparoscopic-assisted
hysterectomy and left salpingo-oophorectomy. Appellants argue that this Court "cannot
assume that [Pinto's] two procedures were included in the types of hysterectomies which Dr.
Appell claims he has performed."

 With respect to his qualifications, Appell's report provides as follows, in pertinent
part:

 I am currently professor in both departments of urology (primarily) and
gynecology at Baylor College of Medicine. I graduated from Jefferson
Medical College in Philadelphia in 1973, then had my surgery training at
George Washington University Medical Center followed by my urological
training at Yale. Following my residency . . . I went on the staff at Louisiana
State University Medical Center in New Orleans where I worked with and
taught gynecologists, thus learning that field while teaching urogynecology to
the gynecologists. . . . I am a clinical researcher as well as active clinician in
female urology and gynecology. I have written text books, authored hundreds
of peer reviewed papers, and won numerous academic awards. With respect
to hysterectomies, I am one of the few urologists in the country performing
them both vaginally and transabdominally. Since 1993[,] I perform
approximately 12/year. They are all associated with prolapse. If there is
pathology in the uterus I transfer the patients to a general or oncologic
gynecologist in the presence of a diseased uterus. Based on my education and
experience, I am qualified to offer medical opinions in this case.


 The documents reviewed for this report include all medical and surgical
records of Lori Cunningham Pinto relating to the surgery performed on July
5, 2005, and thereafter.


 A person who offers an opinion concerning breach of the standard of care in a health
care liability claim must qualify as an expert under section 74.402 of the Civil Practice and
Remedies Code. See Tex. Civ. Prac. & Rem. Code Ann. § 74.402 (Vernon 2005). To offer
an opinion regarding whether the health care provider departed from accepted standards of
care, a person must:

 (1) [be] practicing health care in a field of practice that involves the
same type of care or treatment as that delivered by the defendant health care
provider, if the defendant health care provider is an individual, at the time the
testimony is given or was practicing that type of health care at the time the
claim arose; 


 (2) ha[ve] knowledge of accepted standards of care for health care
providers for the diagnosis, care, or treatment of the illness, injury, or
condition involved in the claim; and 

 (3) [be] qualified on the basis of training or experience to offer an
expert opinion regarding those accepted standards of health care.


Id. § 74.402(b).


 Section 74.402(c) provides as follows:


 In determining whether a witness is qualified on the basis of training or
experience, the court shall consider whether, at the time the claim arose or at
the time the testimony is given, the witness:


 (1) is certified by a licensing agency of one or more states of the United
States or a national professional certifying agency, or has other substantial
training or experience, in the area of health care relevant to the claim; and


 (2) is actively practicing health care in rendering health care services
relevant to the claim.


Id. § 74.402(c).

 For purposes of section 74.402, "practicing health care" includes:

 (1) training health care providers in the same field as the defendant
health care provider at an accredited educational institution; or


 (2) serving as a consulting health care provider and being licensed,
certified, or registered in the same field as the defendant health care provider.


Id. § 74.402(a).

 A physician need not be a practitioner in the same specialty as a defendant to qualify
as an expert. See Broders v. Heise, 924 S.W.2d 148, 153 (Tex. 1996). "Under the Rules of
Evidence, the test is whether the offering party has established that the expert has knowledge,
skill, experience, training, or education on the specific issue before the court." Reddy v.
Seale, No. 09-07-372 CV, 2007 WL 5011608, at *3 (Tex. App.-- Beaumont Mar. 20, 2008,
no pet.) (mem. op.) (citing Tex. R. Evid. 702; Broders, 924 S.W.2d at 153; and Roberts v.
Williamson, 111 S.W.3d 113, 121 (Tex. 2003)).

 Appellants contend in their brief that Appell is not qualified to render an opinion as
to the standard of care applicable to them because Pinto's hysterectomy did not involve
prolapse, and while Young and Francis are gynecologists, Appell is an urologist. A review
of the appellate record, including Pinto's petition, Appell's report, appellants' answer, and
appellants' objections and supplemental objections to Appell's report, does not reveal the
specific medical condition that necessitated Pinto's surgery. (2) In their supplemental
objections to Appell's report, appellants simply made the same argument they assert on
appeal, i.e., that Pinto's condition did not involve prolapse. Appell's report states that he
performs hysterectomies "both vaginally and transabdominally" approximately twelve times
per year solely in cases involving prolapse. However, assuming arguendo that Pinto's
condition did not involve prolapse, we are unpersuaded by appellants' argument that because
Appell specialized in performing hysterectomies on patients suffering from prolapse, he is
unqualified to render an opinion concerning the standard of care in this case.

 Appell's report states that after graduating from Jefferson Medical College, he trained
as a surgeon and then received urological training. In addition, Appell's report states that
while he was on staff at Louisiana State University Medical Center, he "worked with and
taught gynecologists, thus learning that field while teaching urogynecology to the
gynecologists." At one point, Appell's report refers to the field of "urogynecology," which
strongly suggests that the specialties of female urology and gynecology are often interrelated. 
Furthermore, Appell's report explains that he is a professor in both urology and gynecology
at Baylor College of Medicine, and that he is both "a clinical researcher as well as active
clinician in female urology and gynecology."

 Appellants cite this Court's opinion in Talmore v. Baptist Hosps. of S.E. Tex., No. 09-06-024 CV, 2006 WL 2883124 (Tex. App.--Beaumont Oct. 12, 2006, no pet.) as support for
their argument that Appell is unqualified because his report does not state that he performed
the particular type of hysterectomy and oophorectomy that Pinto underwent. In Talmore, the
decedent suffered from several conditions, including hypertension, congestive heart failure,
diabetes, and an abdominal aortic aneurysm, and she therefore received treatment from
numerous doctors from disparate specialties, including an orthopedic surgeon, an infectious
disease specialist, a cardiologist, a pulmonologist, a nephrologist, and a gastroenterologist. 
Id. at **1-3. The expert reports in Talmore applied the same standard of care to the various
specialists, as well as to the hospital. Id. at *2. In the case sub judice, Appell, who practices
both urology and gynecology, opined concerning the standard of care applicable to the
appellant gynecologists who performed Pinto's surgery. Hence, Talmore is inapposite.

 Appellants also cite Broders. In Broders, the decedent, who had been assaulted,
received treatment from three emergency physicians. Broders, 924 S.W.2d at 149-50. The
plaintiffs called another emergency room physician, Dr. Condo, to testify at trial regarding
the standard of care, breach of the standard of care, and causation. Id. at 150-51. Condo
testified that the physicians' failure to properly diagnose and treat the decedent's head trauma
caused her death. Id. at 151. The trial court sustained the defendants' objections to Condo's
testimony on causation. Id. On appeal, the Supreme Court held that the plaintiffs failed to
establish that "Condo's opinions on cause in fact would have risen above mere speculation
to offer genuine assistance to the jury." Id. at 153. However, Broders does not hold that an
expert must have performed the particular procedure at issue. Id. at 153-54. In fact, the
Broders court explained that its

 holding does not mean that only a neurosurgeon can testify about the cause in
fact of death from an injury to the brain, or even that an emergency room
physician could never so testify. What is required is that the offering party
establish that the expert has "knowledge, skill, experience, training, or
education" regarding the specific issue before the court which would qualify
the expert to give an opinion on that particular subject.


Id. at 153. Therefore, Broders does not support appellants' argument.

 With the exception of Talmore and Broders, appellants cite no authorities in support
of their contention that Appell's report must demonstrate that he has performed the particular
type of hysterectomy that Young and Francis performed on Pinto and, as previously
discussed, Talmore and Broders do not so hold. See Tex. R. App. P. 38.1(h).

 We hold that Appell's credentials as set forth in his report qualify him as an expert
under sections 74.402(a), (b), and (c); therefore, the trial court did not err by overruling
appellants' objection to Appell's qualifications. See Tex. Civ. Prac. & Rem. Code
Ann. § 74.402(a), (b), (c). Accordingly, we overrule issue one.

Issues Two and Four


 In issue two, appellants contend that the trial court erred by determining that Appell's
report met the requirements of Chapter 74 and Palacios. In issue four, appellants argue the
trial court erred by determining that Appell's report provided a basis to conclude that Pinto's
claims have merit. We address these issues together.

 A plaintiff asserting a healthcare liability claim must provide each defendant physician
and healthcare provider with an expert report no later than the 120th day after filing suit. 
Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a). The statute defines "expert report" as

 a written report by an expert that provides a fair summary of the expert's
opinions as of the date of the report regarding applicable standards of care, the
manner in which the care rendered by the physician or health care provider
failed to meet the standards, and the causal relationship between that failure
and the injury, harm, or damages claimed.


Id. § 74.351(r)(6). If a plaintiff furnishes the required report within the time permitted, the
defendant may file a motion challenging the report. Id. § 74.351(l).

 The statute provides that the trial court "shall grant a motion challenging the adequacy
of an expert report only if it appears to the court, after hearing, that the report does not
represent an objective good faith effort to comply with the definition of an expert report in
Subsection (r)(6)." Id. When determining whether the report represents a good-faith effort,
the trial court's inquiry is limited to the four corners of the report. Wright, 79 S.W.3d at 53;
Palacios, 46 S.W.3d at 878. To constitute a good-faith effort, the report "must discuss the
standard of care, breach, and causation with sufficient specificity to inform the defendant of
the conduct the plaintiff has called into question and to provide a basis for the trial court to
conclude that the claims have merit." Palacios, 46 S.W.3d at 875. When a plaintiff sues
more than one defendant, the expert report must set forth the standard of care for each
defendant and explain the causal relationship between each defendant's individual acts and
the injury. See Doades v. Syed, 94 S.W.3d 664, 671-72 (Tex. App.--San Antonio 2002, no
pet.); Rittmer v. Garza, 65 S.W.3d 718, 722-23 (Tex. App.-- Houston [14th Dist.] 2001, no
pet.); see also Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a), (r)(6) (A claimant must
provide each defendant with an expert report that sets forth the manner in which the care
rendered failed to meet the standards of care and the causal relationship between that failure
and the injuries claimed.). A report that omits any of the statutory elements is not a good-faith effort. Palacios, 46 S.W.3d at 879. However, an expert report need not marshal all of
the plaintiff's proof. Wright, 79 S.W.3d at 52.

 Appellants argue that Appell's report is speculative, conclusory, assumes facts, and
fails to explain the basis of his statements and to link his conclusions to the facts. Appellants
also argue that the report fails to state the standard of care as to appellants and how
appellants breached the standard of care, and that Appell assumes that appellants Young and
Francis stitched the ureter closed. Appell's report stated that both Young and Francis
performed Pinto's surgery. Appell stated in the report that the medical records reveal that
Pinto's physicians concluded "that a suture was obstructing the ureter and this would
eventually dissolve and allow the ureter to become unobstructed again." Appell's report does
not assume that the ureter was ligated; rather, the report explicitly states that Pinto's post-operative evaluation led to that diagnosis.

 In addition, the report stated that appellants breached the standard of care by "ligating
the ureter which is not a portion of the surgical technique for hysterectomy." The report
further explains that the subsequent medical treatment Pinto required "was the direct result
of having stitched the ureter closed originally." Appell opines in the report that "[t]he
appropriate standard of care in treating a patient with a complete ureteral obstruction would
be to inform the patient of both invasive and non-invasive procedures, including procedures
that would immediately determine the cause of the obstruction such as simply opening the
area to visual examination." Appell's report states that appellants' failure to discuss "all
forms of management including surgical repair of the damaged ureter" with Pinto breached
the standard of care and necessitated further medical treatment, which caused "prolonged
discomfort" and compromised renal function. A laparoscopic-assisted hysterectomy and left
salpingo-oophorectomy involves the surgical removal of certain female reproductive organs,
yet Pinto's petition alleges that during her surgery, Young and Francis ligated her ureter,
which is not one of the female reproductive organs. (3) We hold that under the particular facts
and circumstances presented here, the report adequately stated the standard of care and how
appellants' conduct breached the standard. See generally Tex. Civ. Prac. & Rem. Code
Ann. § 74.351(r)(6). Furthermore, we hold that Appell's report discussed the standard of
care, breach, and causation with sufficient specificity to inform appellants of the conduct
Pinto has called into question and to provide a basis for the trial court to conclude that the
claims have merit. See Palacios, 46 S.W.3d at 875; see also Doades, 94 S.W.3d at 671-72;
Rittmer, 65 S.W.3d at 722-23. We overrule issues two and four.



Issue Three


 In their third issue, appellants argue that Appell was required to serve an expert report
as to OGW. As previously discussed, Pinto's petition alleged that Young and Francis were
employees of OGW, and that OGW was therefore liable for the alleged negligence of Young
and Francis under the doctrine of respondeat superior. Pinto's claims against OGW involve
only OGW's vicarious liability for the actions of Young and Francis, since professional
entities cannot practice medicine. See Hiner v. Gaspard, No. 09-07-240 CV, 2007 WL
2493471, at *5 (Tex. App.--Beaumont Sept. 6, 2007, pet. denied); Univ. of Tex. Sw. Med.
Ctr. v. Dale, 188 S.W.3d 877, 879 (Tex. App.--Dallas 2006, no pet.); In re CHCA Conroe,
L.P., No. 09-04-453 CV, 2004 WL 2671863, at *1 (Tex. App.--Beaumont Nov. 23, 2004)
(orig. proceeding) (mem. op.); Clements v. Conard, 21 S.W.3d 514, 522-23 (Tex. App.--Amarillo 2000, pet. denied). The conduct of OGW is not measured by a medical standard
of care; rather, the basis of those entities' liability involves legal principles. See In re CHCA
Conroe, L.P., 2004 WL 2671863, at *1. Therefore, Pinto was not required to provide an
additional expert report as to OGW. See id.; see also Hiner, 2007 WL 2493471, at *5. 
Accordingly, we overrule issue three and affirm the trial court's judgment.

 AFFIRMED.

 STEVE McKEITHEN

 Chief Justice

Submitted on October 23, 2008

Opinion Delivered November 26, 2008

Before McKeithen, C.J., Gaultney and Kreger, JJ.
1. Pinto argues that appellants did not timely assert their objections to Appell's
qualifications because they did not file their objections until January 30, 2008. However, the
record reflects that on September 14, 2007, Pinto filed her expert report contemporaneously
with her original petition, and that Pinto served Appell's curriculum vitae upon appellants
no later than November 19, 2007. Appellants filed both an answer and objections to the
expert report on October 12, 2007, and appellants' objections included a complaint that
Appell was not qualified to render an expert opinion as to appellants. Therefore, we hold that
appellants timely asserted their objections to Appell's qualifications. See Tex. Civ. Prac.
& Rem. Code Ann. § 74.351(a) (Vernon Supp. 2008) ("Each defendant physician . . . whose
conduct is implicated in a report must file and serve any objection to the sufficiency of the
report not later than the 21st day after the date it was served, failing which all objections are
waived.").
2. The appellate record does not include any of Pinto's medical records. In their
supplemental objections, appellants stated that Pinto's uterus was "diseased" without further
explanation.
3. "Hysterectomy" is defined as the surgical removal of the uterus. Webster's Third
New International Dictionary 1117 (2002). "Oophorectomy" is defined as
"ovariectomy," and "ovariectomy" is defined as the surgical removal of an ovary. Id. at
1578, 1605. With respect to the female reproductive system, "salpingo-" refers to the
fallopian tube. Id. at 2005. "Salpingo-oophorectomy" is defined as "excision of a fallopian
tube and an ovary[.]" Id. "Ureter" is defined as "either of the paired ducts that carry away
urine from a kidney to the bladder[.]" Id. at 2521.