In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________


 

No. 06-02-00182-CR


______________________________




CLAVETON HOLMAN, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the 240th Judicial District Court


Fort Bend County, Texas


Trial Court No. 33289




 




Before Morriss, C.J., Ross and Carter, JJ.


Memorandum Opinion by Justice Carter



MEMORANDUM OPINION



 On December 18, 2000, Claveton Holman pled guilty to the offense of aggravated robbery
in Fort Bend County, cause number 33289. Holman simultaneously pled guilty to a second
indictment for aggravated robbery in Fort Bend County, cause number 33287. After admonishing
Holman about the punishment range applicable in these cases (five to ninety-nine years, or life), the
trial court accepted Holman's plea in both cases, deferred findings of guilt, and (pursuant to a
negotiated plea agreement) placed Holman on community supervision for a period of six years,
provided and conditioned that Holman not use alcohol or controlled substances, report to the
community supervision officer each month, maintain suitable employment, pay a monthly
supervision fee, pay a fine and the costs of court, reimburse the county for court-appointed attorney's
fees, work 300 hours of community service, complete a literacy laboratory and a psychological
evaluation, make a one-time payment to the local Crime Stoppers program, and comply with the trial
court's orders regarding electronic monitoring. 

 On July 25, 2001, the State filed motions to adjudicate Holman's guilt in both cases. The
State subsequently amended its motions to adjudicate Holman's guilt in each case. In a consolidated
hearing, the trial court heard evidence and argument on the amended motions to adjudicate guilt. 
At the conclusion of the hearing, the trial court ruled the State had proven Holman violated the terms
of his community supervision. The court then adjudicated Holman's guilt in both cases and
sentenced him to sixteen years' imprisonment in each case. The two sentences were ordered to be
served concurrently. Holman filed a pro se notice of appeal.

 On January 10, 2003, Holman's appellate counsel filed an Anders (1) brief in which counsel
professionally discussed the record, described the issues reviewed, and concluded there were no
arguable grounds for appeal and, as required by Anders, also filed a motion to withdraw. Counsel
sent Holman a copy of the appellate brief and informed Holman of his right to file a pro se response
and of his right to review the record. 

 This Court informed Holman at that time that his response, if any, was due within thirty days. 
Holman has since requested two extensions of time to file his response brief. We granted both
requests, but as of this date, Holman has not filed a pro se response. Nor has the State filed a brief
in this case. See Tex. Code Crim. Proc. Ann. art. 2.01 (Vernon Supp. 2003) (district attorney shall
represent the State in appeals and has a duty, not to convict, but see justice done); Tex. R. App. P.
38.2 (contents of State's brief); Tex. R. App. P. 38.6(b) (appellee's brief due thirty days after
appellant's brief is filed). We have independently reviewed the record and the brief filed by counsel
in this appeal, and we agree there are no arguable issues that would support an appeal in this case. 

 A trial court cannot revoke a grant of deferred adjudication without a showing that the
defendant violated a condition of his or her supervision. Tex. Code Crim. Proc. Ann. art. 42.12,
§ 5(b) (Vernon Supp. 2003) (on violation of a condition, defendant may be arrested and held for
adjudication hearing). However, once it is shown the defendant violated a term of the condition of
his or her community supervision, the trial court may adjudicate the defendant's guilt and proceed
to sentencing as if the granting of community supervision had not occurred. Id. No appeal may be
taken from the trial court's decision to proceed to an adjudication of guilt. Id. Accordingly, courts
of appeals may not review the factual or legal sufficiency of the evidence to support the trial court's
decision to proceed to an adjudication of guilt. The scope of courts of appeals' ability to review
cases such as this is generally limited to matters arising from the trial court's punishment hearing. 
Id.; Washington v. State, 71 S.W.3d 498 (Tex. App.-Tyler 2002, no pet.). 

 Because the trial court had adjudicated Holman's guilt for an offense listed in Article 42.12,
Section 3g, the trial court's sole option in sentencing was imprisonment. See Tex. Code Crim.
Proc. Ann. art. 42.12, § 3g(1)(F) (Vernon Supp. 2003) (judge may not order community supervision
for a defendant adjudged guilty of aggravated robbery). The punishment assessed in both cases was
sixteen years' imprisonment, which is on the lower end of the statutory range. See Tex. Pen. Code
Ann. § 12.32 (Vernon 2003) (statutory range for first-degree felony is five to ninety-nine years, or
life); Tex. Pen. Code Ann. § 29.03 (Vernon 2003) (aggravated robbery is first-degree felony). The
record demonstrates no evidence the trial court abused its discretion in sentencing Holman within
a range provided for by statute.



 We affirm the trial court's judgment.



 Jack Carter

 Justice



Date Submitted: May 28, 2003

Date Decided: July 8, 2003


Do Not Publish
1. Anders v. California, 386 U.S. 738 (1967).



 document.write( '
Close' );
 document.write( '' );
 }

 suffering a fractured hip. He died in November 2003, and the petition alleged his
death was the result of complications from the broken hip and subsequent surgery. NEMC filed a
motion with the trial court to dismiss the suit, alleging Crooks failed to comply with the
requirements of the Texas Civil Practice and Remedies Code. See Tex. Civ. Prac. & Rem. Code
Ann. § 74.351 (Vernon Supp. 2005). 
            Crooks filed suit against NEMC and Community, two health care providers, alleging that
negligence on the part of NEMC and Community led to Mr. Crooks' falling on the night of May 1,
2003. In one fall, Mr. Crooks' hip was broken, and he was transferred to another hospital. He died
six months later. A report from Richard Baldwin, D.O., stated that NEMC's conduct when
Mr. Crooks was their patient fell below the applicable standard of care and caused his resulting
injuries, including two facial lacerations and a fractured left hip. Baldwin's report also stated that
such fall "proximately caused the left hip fracture that started the slow deterioration of this 78 year
old patient with multiple medical problems, who could not survive the challenges of a hip fracture,
surgery, and significant recovery period." 
            We review a trial court's decision on a motion to dismiss, filed pursuant to Section 74.351
of the Texas Civil Practice and Remedies Code, for an abuse of discretion. Am. Transitional Care
Ctrs. of Tex., Inc. v. Palacios, 46 S.W.3d 873, 875 (Tex. 2001) (addressing Section 74.351's
predecessor, former Article 4590i, Section 13.01(e)). 
EXPERTS WERE QUALIFIED TO DISCUSS STANDARD OF CARE
            Dr. Baldwin's Report
            Appellants claim the trial court was required to grant their motion to dismiss because the
Crooks did not timely file an adequate expert report. See Tex. Civ. Prac. & Rem. Code Ann.
§ 74.351. Appellants base this contention on perceived inadequacies in the qualifications of Crooks'
two proffered experts, Dr. Baldwin and Frances Foster, a registered nurse. According to the
appellants, Baldwin and Foster were not qualified to offer expert opinions on the applicable standard
of care Mr. Crooks should have been afforded. Appellants claim that, in the cases of both Foster and
Baldwin, the respective curriculum vitaes (CV) and reports of both affiants fail to establish either
was qualified to render an opinion concerning the standard of care applicable to either a hospital or
its employees. 
            A plaintiff, after filing a health care liability claim, is required to serve on each party an
expert report. The contents of the report must comply with statutory requirements. Tex. Civ. Prac.
& Rem. Code Ann. § 74.351. To qualify as an expert to render an opinion regarding whether a
health care provider departed from the standard of care, one must meet the requirements set out in
Section 74.351(r)(5)(B), which mandates that an expert must qualify under Section 74.402. Section
74.402(b)(1) requires that the expert witness must practice health care in a field of practice that
involves the same type of care or treatment as that delivered by the defendant health care provider,
if the defendant health care provider is an individual. Tex. Civ. Prac. & Rem. Code Ann.
§ 74.402(b)(1) (Vernon 2005). However, as to health care providers other than individuals, the
requirement is that the expert must have knowledge of accepted standards of care for health care
providers for the diagnosis, care, or treatment of the illness, injury, or condition involved and must
be qualified on the basis of training or experience to offer an expert opinion regarding accepted
standards of health care. Tex. Civ. Prac. & Rem. Code Ann. § 74.402(b)(2)(3) (Vernon 2005). In
other words, unless the defendant is an individual, there is no requirement that the reporting expert
must practice in the health care field involving the same type of care as that delivered by the
defendant. 
            In support of their argument, the appellants cite In re Samonte


 and In re Windisch.


 Both
of these cases involved health care providers who were individuals, as opposed to other legal entities. 
In the instant case, Crooks sued NEMC and Community. From the record before us, these two
defendants are plainly not individuals. Appellants' arguments about the qualifications of Baldwin
and Foster contend that nothing in either expert's report or CV states whether they were working in
the nursing field at the time of Mr. Crooks' falls or, when her report was written, in Ms. Foster's case,
or, in Dr. Baldwin's case, had admitting privileges at any hospital at the pertinent times. Appellants
also point out there is nothing to indicate Dr. Baldwin was teaching medical students at the time of
Mr. Crooks' falls or when Dr. Baldwin wrote his report. 
            Since the named defendants were not individuals,


 the requirement in Section 74.402(b)(1)
does not apply. The requirement that the expert offering his or her opinion practice in the same field
of care or treatment as the defendant only applies when the "defendant health care provider is an
individual." Tex. Civ. Prac. & Rem. Code Ann. § 74.402(b)(1). Therefore, Crooks' experts were
required to comply with subsection (b)(2) and (3), and demonstrate knowledge of the accepted
standards of care of the injury or condition involved in the claim and that they were qualified on the
basis of training or experience to offer expert opinions regarding said accepted standards of care. 
Tex. Civ. Prac. & Rem. Code Ann. § 74.402(b)(1)–(3). 
            In determining whether an expert is qualified "on the basis of training or experience," a trial
court is to consider whether, at the time the claim arose, or at the time the purported expert gave his
or her opinion or testimony, that person 
(1) is certified by a licensing agency of one or more states of the United States
or a national professional certifying agency, or has other substantial training or
experience, in the area of health care relevant to the claim; and 
 
(2) is actively practicing health care in rendering health care services relevant
to the claim. 

Tex. Civ. Prac. & Rem. Code Ann. § 74.402(c)(1), (2) (Vernon 2005). 
            "Practicing health care" includes:
(1) training health care providers in the same field as the defendant health
care provider at an accredited educational institution; or
 
(2) serving as a consultant health care provider and being licensed, certified,
or registered in the same field as the defendant health care provider. 

Tex. Civ. Prac. & Rem. Code Ann. § 74.402(a)(1), (2) (Vernon 2005).

            The proffered expert report in Samonte was found lacking because it did "not contain any
information . . . that describes [the purported expert's] qualifications, [did not] inform[]" that the
purported expert had ever worked in the field (anesthesiology) pertinent to that case's alleged injury
or was currently working in that field; the report was not on letterhead, not dated, or signed; did not
discuss the purported expert's training, experience, or how he was qualified to render his opinion on
the appropriate standards of care and alleged breach. Samonte, 163 S.W.3d at 237. 
            The opining expert in Windisch was a radiologist, as was the defendant. The expert was a
teacher and had served a fellowship in neuroradiology. However, his report was inadequate for the
statutory purposes because nowhere did it indicate he had experiences which could "reasonably be
said to demonstrate that he has knowledge of the accepted standard of care for the procedure" at
issue. Windisch, 138 S.W.3d at 514. And while the report asserted the expert had been practicing
medicine for many years, it lacked any explanation of how the expert's experience and credentials
made him familiar with embolization of brain tumors, the matter on which the plaintiff offered the
opinion. Id. (citing Broders v. Heise, 924 S.W.2d 148, 153 (Tex. 1996)). 
            Here, the standard of care applicable to the defendant health care providers is what an
ordinarily prudent hospital would do under the same or similar circumstances. Palacios, 46 S.W.3d
at 880. The circumstances of this case involve the supervision of an elderly hospital patient who was
admitted to the hospital "for aggressive behavior and severe psychosis." NEMC's emergency record
stated Mr. Crooks was "very confused and listed his diagnosis for admission as ileus [obstruction
of the intestines] and dehydration." The core of Crooks' allegations was that negligence of the
hospital and its nursing staff in failing to adequately supervise Mr. Crooks led to his broken hip, and
the broken hip in turn led to his declining health and, ultimately, his death. Dr. Baldwin's report
claims he is familiar with the applicable standard of care for a "primary care, family practice
specialist in the State of Texas." He states he is "knowledgeable regarding the standard of care for
family physicians in writing basic hospital admission orders that direct the hospital nursing staff
regarding activities such as bedrest absolute and with vs. without restraints, ambulation with vs.
without assistance, bathroom privileges, etc.," as well as the "standard of care for nurses and the
medical facilities they work for . . . ." The report continues with Baldwin's familiarity with these
standards of care related to "following basic hospital admission orders that direct the hospital and
its nursing staff regarding activities such as bedrest" with and without restraints and ambulation with
and without assistance. 
            The report stated that Dr. Baldwin was licensed to practice medicine in the State of Texas,
and listed his license number. He detailed his experience, education, and training. He worked
twenty-six years in the Department of General and Family Practice at the University of North Texas
Health Science Center–Texas College of Osteopathic Medicine, Fort Worth, Texas. Dr. Baldwin
was "retired from UNTHSC-Fort Worth [in] January 2002" and "continued to practice as a private
family physician"; the report lists the name of the clinic where Dr. Baldwin worked. The training
and experience needed for a physician to offer an opinion regarding the standard of care for routine
hospital admission orders and staff activities needed to prevent a patient from falling out of bed are
certainly not as extensive as that needed to express an opinion regarding the standard of care for the
"performance of embolization of brain tumors" as was present in Windisch. See Windisch, 138
S.W.3d at 514. In light of the previously quoted language expressing Baldwin's familiarity with
primary care facilities, we hold Baldwin was qualified under the requirements of Section 74.402(b)
and (c). Based on our review of the allegations in Crooks' petition, it is clear that Dr. Baldwin's
report addressed the specific subject matter at issue in the case. See id. at 513. We hold the trial
court did not abuse its discretion in overruling the objections to Baldwin's qualifications to opine on
the standard of care. 
            Frances Foster's Report
            NEMC and Community make the same complaint about the qualifications of Foster. Again,
because NEMC and Community were both legal entities, as opposed to individuals, Section
74.402(b)(1) does not apply. It was not necessary for Foster's report to state that she practiced in a
field offering the same kind of care or treatment as the defendant health care providers. 
            Foster is certified as a gerontological nurse practitioner and a registered nurse. Foster's report
lists her credentials, education, and experience, and claimed she was "familiar with the following
standards for providing reasonable and prudent nursing care. . . ." The report then lists state and
federal statutory nursing requirements, as well as other requirements. She had "[o]ver 35 years[']
[experience] of clinically caring for elder persons," and "[b]asic, advanced, and continuing nursing
education regarding elder care including fall prevention." The report details specific standards of
nursing care and points out specific discrepancies between those standards and the nursing practices
followed by NEMC's and Community's employees. In her report, she discusses medications
administered to Mr. Crooks and "well-known adverse reactions" to such medications. She discusses
how those possible side effects would have impacted the standard of care due Mr. Crooks by the
nursing staff. 
            Regarding whether Foster was "qualified on the basis of training or experience" to offer her
expert opinion, her report demonstrated she was certified by an appropriate licensing agency and had
substantial training and experience in the relevant health care area. See Tex. Civ. Prac. & Rem.
Code Ann. § 747.402(c)(1). Foster listed as qualifications her status as a Geriatric Nurse Consultant
to the United States Department of Justice, Civil Rights Division; and consultant to a Multi-Level
Geriatric Health Care Center in Dallas, Texas. We have noted earlier her certification as a registered
nurse. See Tex .Civ. Prac. & Rem. Code Ann. § 74.402(c)(2). The trial court did not abuse its
discretion finding Foster to be qualified to offer an expert opinion on the applicable standards of
care. 
            Causal Link
            Appellants' third point of error contends Dr. Baldwin's report failed to adequately describe
any causal relation between NEMC's alleged breach of standard of care and the ultimate death of
Mr. Crooks. 
            An expert report, for purposes of Section 74.351, must discuss the standard of care, breach,
and causation with sufficient specificity to inform the defendant of the conduct the plaintiff has
called into question and to provide a basis for the trial court to conclude that the claims have merit. 
Palacios, 46 S.W.3d at 875. "However, to avoid dismissal, a plaintiff need not present evidence in
the report as if it were actually litigating the merits." Id. at 879. And a trial court is obligated to
grant a challenge to the sufficiency of an expert report only if the report "does not represent an
objective good faith effort to comply" with the requisites of the statute. Tex. Civ. Prac. & Rem.
Code Ann. § 74.351(l). While the expert report does not need to marshal all the evidence necessary
to establish causation at trial, it must contain sufficiently specific information to demonstrate
causation beyond mere conjecture. See Bowie Mem'l Hosp. v. Wright, 79 S.W.3d 48, 52 (Tex. 2002). 
            Mr. Crooks died approximately six months after sustaining the fall and the resulting injuries. 
Dr. Baldwin's report states that the nursing staff failed to adequately monitor Mr. Crooks, and this
breach of the standard of care led to his falling and sustaining a broken hip. The report states
Dr. Baldwin's opinion as to what the hospital should have done differently, such as keeping a
"vigilant watch" over him and seeking physician's orders to physically restrain him to his bed. 
Following his discussion of the standards of care applicable to Mr. Crooks' treatment, Dr. Baldwin
makes the following statement regarding these alleged breaches of standard of care and Mr. Crooks'
injury and death: "The acts and omission of the facility and the hospital staff of Northeast Medical
Center that fell below the standard of care proximately caused the left hip fracture that started the
slow deterioration of this 78 year old patient with multiple medical problems, who could not survive
the challenges of a hip fracture, surgery, and significant recovery period." Immediately before this
statement, Dr. Baldwin discusses the events from about midnight to 3:15 a.m., when Mr. Crooks was
found out of bed on the floor of his room at least twice; Dr. Baldwin states, "the standard of care
required . . . is to restrain a confused patient," and the hospital and its staff "fell below the standard
of care" by failing to restrain Mr. Crooks or to request orders for physical restraints after his first
time to be found out of bed. 
            Crooks' petition alleged wrongful death and survivor claims. As stated earlier, Mr. Crooks
died six months after the broken hip sustained at NEMC. Although we find that Baldwin was
qualified to discuss the standard of care due, we find the report does not draw a causal connection
from the hip injury to Mr. Crooks' subsequent death. Baldwin's report progresses from identifying
the breaches of the standard of care to asserting that such breaches "started the slow deterioration"
and that Mr. Crooks "could not survive the challenges of a hip fracture, surgery, and significant
recovery period." 
            NEMC complains that Dr. Baldwin's opinion regarding causation is conclusory. The
breaches of the standards of care, according to the expert report, were the proximate cause of
Mr. Crooks' injuries and "started [his] slow deterioration." In Wright, the Texas Supreme Court held
that, where the expert's report lacked information linking the expert's conclusion (that the patient
might have come to a better outcome) to the hospital's alleged breach (not correctly reading and
acting on x-rays), the trial court was within its discretion to find the report conclusory and, therefore,
inadequate. Wright, 79 S.W.3d at 53.


 The expert "must explain the bases of the statements [made
regarding causation] and link his or her conclusions to the facts." Longino v. Crosswhite, 183
S.W.3d 913, 917–18 (Tex. App.—Texarkana 2006, no pet.) (citing Wright, 79 S.W.3d at 52). 
Although the report ably links breaches in care to the injuries sustained by Mr. Crooks, no such links
are provided to his death. Dr. Baldwin's statement that the broken hip, proximately caused by
NEMC's breaches of the standard of care, started Mr. Crooks' "slow deterioration," which eventually
resulted in his death, is conclusory. Absent some specific information connecting Mr. Crooks' fall
and broken hip to his death, we find the trial court abused its discretion in finding the report adequate
for Section 74.351 purposes concerning the wrongful death claim.



            NEMC and Community admit "Mr. Crooks fell and broke his hip while in the hospital. This
fact is not in dispute." The report explains that the "failure of the facility and its nursing staff to take
the steps set out above proximately caused Mr. Crooks to fall out of bed the second time and his
resulting injuries, including two facial lacerations and a fractured left hip." The survival cause of
action is based on those injuries. There is no contention that the expert report does not assert a
causal connection as to these injuries. Consequently, the survival action is viable.
            Accordingly, we reverse the trial court's decision as to the wrongful death cause of action,
and remand the case for trial on the survival action and for further proceedings consistent with this
opinion.




                                                                        Jack Carter
                                                                        Justice
 
Date Submitted:          March 21, 2006
Date Decided:             May 19, 2006