In The 



Court of Appeals



Ninth District of Texas at Beaumont


________________



NO. 09-09-00169-CV


 _____________________



SAMUEL J. PANGBURN, CHARLES S. DAY, NESTOR CAGOL PUNAY 


AND BAPTIST HOSPITALS OF SOUTHEAST TEXAS D/B/A 


MEMORIAL HERMANN BAPTIST BEAUMONT HOSPITAL AND 


D/B/A MEMORIAL HERMANN BAPTIST ORANGE HOSPITAL, Appellants



V.



IVALYN ANDERSON AND LEE O. ANDERSON, INDIVIDUALLY AND AS


REPRESENTATIVE OF IVALYN ANDERSON, Appellees







On Appeal from the 60th District Court


Jefferson County, Texas


Trial Cause No. B-182,642






MEMORANDUM OPINION



 Ivalyn Anderson and Lee Anderson filed a healthcare liability suit against appellants
Dr. Samuel Pangburn, Dr. Charles Day, Dr. Nestor Punay, and Baptist Hospitals of Southeast
Texas d/b/a Memorial Hermann Baptist Beaumont Hospital and d/b/a Memorial Hermann
Baptist Orange Hospital and other defendants. Appellants filed motions to dismiss that
challenged appellees' expert reports. See Tex. Civ. Prac. & Rem. Code Ann. § 74.351(l)
(Vernon Supp. 2009). The trial court denied the motions. We affirm as to the report
concerning the claim against Pangburn. Because the reports are inadequate for the claims
against Day, Punay, and Baptist Hospital, we reverse and remand the case to the trial court
for further proceedings consistent with this opinion. 

The Statute


 A plaintiff asserting a healthcare liability claim must provide each defendant physician
and healthcare provider with an expert report no later than the 120th day after filing suit. 
Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a) (Vernon Supp. 2009). The statute defines
"expert report" as

 a written report by an expert that provides a fair summary of the expert's
opinions as of the date of the report regarding applicable standards of care, the
manner in which the care rendered by the physician or health care provider
failed to meet the standards, and the causal relationship between that failure
and the injury, harm, or damages claimed.


Id. § 74.351(r)(6). If a plaintiff furnishes the required report within the time permitted, the
defendant may file a motion challenging the report. Id. § 74.351(l).

 A trial court must look at all the reports served by the plaintiff and determine whether,
viewed together, the reports address each of the required elements. Id. § 74.351(i). The
statute provides that the trial court "shall grant a motion challenging the adequacy of an
expert report only if it appears to the court, after hearing, that the report does not represent
an objective good faith effort to comply with the definition of an expert report in Subsection
(r)(6)." Id. § 74.351(l). When determining whether a report represents a good-faith effort,
the trial court's inquiry is limited to the four corners of the report. Bowie Mem'l Hosp. v.
Wright, 79 S.W.3d 48, 53 (Tex. 2002); Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,
46 S.W.3d 873, 878 (Tex. 2001). To constitute a good-faith effort, the report "must discuss
the standard of care, breach, and causation with sufficient specificity to inform the defendant
of the conduct the plaintiff has called into question and to provide a basis for the trial court
to conclude that the claims have merit." Palacios, 46 S.W.3d at 875. 

 When a plaintiff sues more than one defendant, the expert report must set forth the
standard of care for each defendant and explain the causal relationship between each
defendant's individual acts and the injury. See Doades v. Syed, 94 S.W.3d 664, 671-72 (Tex.
App.--San Antonio 2002, no pet.); Rittmer v. Garza, 65 S.W.3d 718, 722-23 (Tex. App.--Houston [14th Dist.] 2001, no pet.); see also Tex. Civ. Prac. & Rem. Code Ann. §
74.351(a), (r)(6) (A claimant must provide each defendant with an expert report that sets
forth the manner in which the care rendered failed to meet the standards of care and the
causal relationship between that failure and the injuries claimed.). A report that omits any
of the statutory elements is not a good-faith effort. Palacios, 46 S.W.3d at 879.

 Under the statute, a witness may be qualified as an expert on the issue of whether a
physician departed from standards of medical care if the person is a physician who: (1) is
practicing medicine at the time of the testimony or at the time the claim arose; (2) has
knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the
illness, injury, or condition involved in the claim; and (3) is qualified on the basis of training
or experience to offer an expert opinion regarding those accepted standards. Tex. Civ. Prac.
& Rem. Code Ann. § 74.351(r)(5)(A) (Vernon Supp. 2009), § 74.401(a) (Vernon 2005). In
deciding whether a witness is qualified on the basis of training or experience, a trial court
must consider whether, at the time the claim arose or at the time the testimony is given, the
witness: "(1) is board certified or has other substantial training or experience in an area of
medical practice relevant to the claim; and (2) is actively practicing medicine in rendering
medical care services relevant to the claim." Tex. Civ. Prac. & Rem. Code Ann. §
74.401(c) (Vernon 2005). To express expert opinion testimony on causation in healthcare
liability cases against physicians, the expert must be a physician and "otherwise qualified to
render opinions on such causal relationship under the Texas Rules of Evidence[.]" Tex. Civ.
Prac. & Rem. Code Ann. § 74.351(r)(5)(C) (Vernon Supp. 2009). Under the Texas Rules
of Evidence, a witness must have knowledge, skill, experience, training, or education
regarding the specific issues before the court. Broders v. Heise, 924 S.W.2d 148, 153 (Tex.
1996); see also Tex. R. Evid. 702. 

 We review a trial court's decision regarding the adequacy of an expert report under
an abuse of discretion standard. Wright, 79 S.W.3d at 52 (citing Palacios, 46 S.W.3d at
878). "A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner
without reference to any guiding rules or principles." Wright, 79 S.W.3d at 52. A trial court
abuses its discretion if it fails to analyze or apply the law correctly. Walker v. Packer, 827
S.W.2d 833, 840 (Tex. 1992).

Background


 Plaintiffs submitted expert reports from Dr. Louis Silverman, Dr. Joel Meyer, and
Melanie Paquette, a registered nurse. The reports describe Ivalyn Anderson's medical
treatment and condition. Anderson suffered from breast cancer and underwent a right
modified radical mastectomy. Post-operative chemotherapy was recommended, which
required long-term venous access and port-a-cath placement. Dr. Pangburn surgically
inserted the port-a-cath for Anderson's chemotherapy at Memorial Hermann Hospital in
Orange, Texas. Dr. Day, a radiologist, dictated a report in which the port-a-cath was noted
to be in place. In Pangburn's post-operative notes, he noted he had difficulty getting the
catheter into the sheath as well as blood loss through the sheath, which he attributed to a
manufacturing defect. He also noted elevated venous pressure. 

 Upon needle access of the port-a-cath, Dr. Gwendolyn Lavalais noted forceful
immediate blood return, an abnormal response. Lavalais questioned the placement of the
port-a-cath and an x-ray contrast study was completed. After radiologist Dr. Stephen
Cherewaty interpreted the x-ray contrast study as normal, Lavalais proceeded to inject the
chemotheraputic agent Pactitaxel into the port-a-cath. 

 Anderson complained of right-sided weakness, headache, and difficulty ambulating. 
Lavalais ceased administering the chemotherapy and admitted Anderson to Memorial
Hermann Baptist Cancer Institute in Beaumont for evaluation of stroke. Dr. Punay, a
neurologist, determined that an MRI of the brain was normal. Anderson was discharged
from Memorial Hermann Baptist Hospital with instructions to followup with Punay and
Lavalais.

 Anderson was re-admitted to Memorial Hermann Baptist Hospital with altered mental
status. Dr. Dan Karnicki read a chest x-ray as showing the catheter tip to be in the
appropriate position. 

 At her family's request, Anderson was transferred to Methodist Hospital, Houston,
for further care. Tests done at Methodist demonstrated that the port-a-cath had been
misplaced, and had punctured the left subclavian vein and entered the adjacent left
subclavian artery. A doctor at Methodist removed the misplaced port-a-cath. 

 In Lavalais's discharge notes dictated on October 13, 2006, she described the presence
of new lesions in both cerebral hemispheres and the cerebellum. The lesions were initially
thought to be metastatic breast cancer, but further studies showed that the tip on the port-a-cath was in the ascending aorta rather than the superior vena cava. 

 Anderson was transferred to rehabilitation and then discharged to home care. At the
time she was discharged, she suffered from persistent disorientation and impaired speech,
could only walk one-hundred-fifty feet with a rolling walker, and required twenty-four-hour
supervision. Her final diagnosis was acute right thalamic and cerebellum cerebrovascular
accident "possible embolic." 

 Plaintiffs' expert, Dr. Louis Silverman, is a board certified general and thoracic
surgeon. Plaintiffs' expert, Dr. Joel Meyer, is a board-certified neuroradiologist. Melanie
Paquette, a registered nurse, provided a report regarding Baptist's treatment of Anderson.

Adequacy of the Reports as to Pangburn


 Pangburn, the surgeon who inserted Anderson's port-a-cath, argues Silverman and
Meyer are not qualified to provide expert opinions on the cause of brain lesions. He contends
Silverman's and Meyer's causation opinions failed to provide a fair summary of how
Pangburn caused the injury. (1)

 Pangburn notes that Meyer's report did not mention Pangburn, but acknowledges
Meyer's report states that "early recognition of the port-a-cath in the aorta would have
prompted removal of the port-a-cath which would have prevented subsequent infarcations." 
Pangburn challenges Meyer's qualifications to render an opinion that the chemotherapy drug
is toxic when delivered to an artery and argues that Meyer's curriculum vitae and report do
not demonstrate that he has experience or training relating to the chemotherapy drug or in
diagnosing brain lesions. Pangburn argues Meyer's report fails to explain (1) how
administering the chemotherapy drug to an artery differs from administering it to a vein, (2)
how the chemotherapy drug is toxic, and (3) why the drug causes brain lesions.

 Meyer is a board-certified neuroradiologist with sub-specialties in neurology and
radiology, and he states in his report that he has "read films in [his] practice such as those
involved herein on many occasions[,] made proper diagnoses of misplaced porta caths[,]
made correct neurologist diagnoses in [his] practice such as should have been made by the
neurologist in this case, and made treatment recommendations based upon those correct
diagnoses." The report indicates he is qualified to express an opinion on the cause of the
injury. 

 Pangburn argues that while Silverman may be qualified to give an opinion as to the
standard of care for a surgeon's insertion of a port-a-cath, Pangburn challenges Silverman's
qualifications to render a causation opinion. Pangburn also contends that Silverman's
curriculum vitae and report fail to show that Silverman has any training or experience (1)
with the chemotherapy drug administered here, (2) in diagnosing brain lesions, and (3)
related to whether the chemotherapy drug causes brain lesions. 

 Silverman's report states that the standard of care for the insertion of the port-a-cath

 requires "smooth entry[,]" that "[r]esistance to passage indicates most likely malposition and
requires removal and reinsertion[,]" and that "[h]igh-pressure back flow is clearly abnormal
and is an indication suggestive of problematic placement." He further states that Pactitaxel,
the chemotherapy drug administered to Anderson, was toxic when injected intra-arterially. 
According to Silverman, the intra-arterial injection, in all reasonable medical probability, was
the direct cause of Anderson's neurological injury that "more likely than not, would have
been avoided had Pangburn correctly cannulated Ms. Anderson's subclavian vein." 

 In his report, Silverman states he is "a board certified general and thoracic surgeon
in active practice" and treats breast cancer patients like Anderson who require long-term
venous access for chemotherapy. He "perform[s] breast biopsies and radical mastectomy and
insertion of port-a-cath devices for long-term venous access[.]" The report indicates
Silverman is qualified to render an opinion as to the standard of care for inserting port-a-cath
devices. See Tex. R. Evid. 702; Broders, 924 S.W.2d at 153. 

 Together, the Silverman and Meyer reports satisfy the requirements of the statute as
to the claim against Pangburn. See Tex. Civ. Prac. & Rem. Code Ann. § 74.351(i). We
overrule Pangburn's issues. 

Adequacy of the Reports as to Day

 Day, the radiologist who reviewed chest films taken while Anderson was a patient at
Baptist Hospital in Orange, asserts that the three reports wholly fail to address the standard
of care applicable to him, how he breached the standard of care, and how he caused
Anderson's injury. He maintains that Silverman and Paquette are not qualified to address the
applicable standard of care, breach, or causation.

 Paquette is not a physician, and therefore, does not qualify as an expert witness on the
standard of care applicable to Day or whether Day breached that standard of care. See Tex.
Civ. Prac. & Rem. Code Ann. § 74.401(a). Only a physician is qualified to render an expert
report opinion as to causation. See Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(5)(c);
74.401(a). Silverman's report and curriculum vitae fail to demonstrate that he is qualified
on the basis of training or experience to offer an expert opinion regarding the standards of
medical care applicable to Day. See Tex. Civ. Prac. & Rem. Code Ann. § 74.401(a). 
Silverman is not a board-certified radiologist. His report does not state he practices
radiology, and does not state his experience in interpreting chest x-rays. See Tex. Civ. Prac.
& Rem. Code Ann. § 74.401(c). The expert reports prepared by Silverman and Paquette are
inadequate as to Day. Those reports fail to name Day at all, do not set out the standard of
care for a radiologist, and do not explain any breach of the standard of care by Day. See
Taylor v. Christus Spohn Health Sys. Corp., 169 S.W.3d 241, 244 (Tex. App.--Corpus Christi
2004, no pet.); Wood v. Tice, 988 S.W.2d 829, 831 (Tex. App.--San Antonio 1999, pet.
denied). 

 Meyer states in his report that "[r]adiology reports regarding catheter tip placement
are incorrect, including the chest x-ray reviewed and dictated by Charles Day, M.D., dated
8-16-06[.]" Meyer's report later states that Anderson's brain infarcations were, in reasonable
medical probability "caused by the breaches of the standard of care by Stephen Cherawaty,
M.D., Dan Karnicki, M.D., Charles Day, M.D., and Nestor Punay, M.D." Generally, a report
may not simply assert that multiple defendants are all negligent for failing to meet the
standard of care without explaining how each defendant specifically breached the standard
and how that breach caused or contributed to cause the injury. See Taylor, 169 S.W.3d at
244; Wood, 988 S.W.2d at 831. Greater specificity is required.

 Meyer's report states that Day's radiology report was "incorrect," but the report does
not state that the x-ray itself demonstrates the catheter was misplaced. It is not entirely clear
from the report that an x-ray of the type reviewed by Day would reveal the misplacement in
this case, or that Meyer believes Day should have conducted a different test. Meyer's report
is deficient as to Day in that it fails to discuss the standard of care applicable to a radiologist
reporting or reviewing the chest x-ray under the circumstances, and how Day breached that
standard of care. See Palacios, 46 S.W.3d at 880. The reports are not sufficiently specific
as to the claim against Day. 

Adequacy of the Reports as to Punay

 Punay, the neurologist who was consulted during Anderson's hospitalization
subsequent to the insertion of the port-a-cath, argues all three experts are not qualified to
opine about the standard of care for a neurologist. He maintains that the reports fail to meet
the statutory requirements of section 74.351. 

 Paquette is not a physician and does not qualify as an expert witness on the standard
of care applicable to Punay or whether he breached that standard of care, nor can she render
an expert opinion as to causation. See Tex. Civ. Prac. & Rem. Code Ann. §§
74.351(r)(5)(C); 74.401(a). Silverman's report and curriculum vitae do not show his
qualifications to render an expert opinion as to the standard of care applicable to a
neurologist, or how Punay breached the standard of care. See Tex. Civ. Prac. & Rem. Code
Ann. § 74.401(a). He is not a board-certified neurologist, does not state he practices
neurology, and does not state that he has training or experience in neurology. See Tex. Civ.
Prac. & Rem. Code Ann. § 74.401(c). However, Meyer's report states he has sub-specialties in both neurology and radiology and is "familiar with the standards of care as to
each of the radiologists as well as the neurologist [Punay], by training, education, and
experience[,] and made correct neurological diagnoses in [Meyer's] practice such as should
have been made by the neurologist in this case[.]" 

 Punay argues that even if the experts can be shown to be qualified, their reports fail
to meet the statutory requirements of section 74.351. Meyer makes the conclusory statement
that Punay should have made the correct neurological diagnosis. Although he states that
"this failure is a breach of the standard of care by Stephen Cherawaty, M.D., Dan Karnicki,
M.D., Charles Day, M.D. and Nestor Punay, M.D.[,]" the report does not specifically state
what "this failure" refers to in regards to Punay. Meyer's report later states that Anderson's
brain infarcations were, in reasonable medical probability "caused by the breaches of the
standard of care by Stephen Cherawaty, M.D., Dan Karnicki, M.D., Charles Day, M.D., and
Nestor Punay, M.D." The expert reports, however, do not discuss Punay's treatment of
Anderson, state the standard of care for a neurologist, state specifically how Punay breached
that standard of care, or explain how the breach caused the injuries. See Taylor, 169 S.W.3d
at 244; Wood, 988 S.W.2d at 831. The reports are not sufficiently specific as to the claim
against Punay. Adequacy of the Reports as to Baptist

 Baptist maintains (1) Paquette's expert report addressing causation cannot satisfy
section 74.351's requirements, and (2) an expert report that would require a nurse to request
that a physician change an order or utilize the "chain of command" cannot adequately address
causation without a qualified expert's opinion that the physician's order was improper. 
Baptist argues the report does not explain how the outcome would have been different but
for the conduct of the nurses. Baptist contends that the expert reports do not include any
opinions by a physician as to how Baptist caused the injury. See Tex. Civ. Prac. & Rem.
Code Ann. § 74.351(r)(5)(C). 

 Pacquette's report adequately addresses the standard of care and alleged breach.
Silverman's report mentions Baptist as a hospital where Anderson was treated. The report
does not adequately address how Baptist caused the injury, however, and Pacquette is not a
medical doctor. Meyer's report states he reviewed records from Baptist, but his report does
not discuss Anderson's treatment at Baptist or how Baptist caused the injury. 

 Baptist contends the Andersons had an opportunity to secure an expert report to show
that Lavalais's orders were inappropriate and violated the standard of care, which according
to Baptist, the Andersons were "clearly . . . unable to" do because Lavalais was non-suited. 
According to Baptist, this Court has no discretion to allow the Andersons an extension of
time to cure the deficiencies as to Baptist because that would essentially allow the Andersons
more time to provide an expert report as to Lavalais. Baptist also states that "[t]he
convoluted result would be that Baptist Hospital's nurses would have to defend their alleged
failure to second-guess a proper order, where the physician herself has already been absolved
of any responsibility."

 The effect of the non-suit on any allegation against Lavalais is not the issue in this
appeal. We do not resolve the merits of the plaintiffs' claim in this proceeding. The only
issue we address is whether the reports comply with the requirements of the statute. The
expert reports are deficient in that they do not sufficiently address how Baptist's conduct
caused the injury. Because the reports are deficient as to one of the required elements, the
Court has discretion to remand the case for the trial court to consider granting a thirty-day
extension of time to cure the deficiencies. See Leland v. Brandal, 257 S.W.3d 204, 208 (Tex.
2008); see also Lewis v. Funderburk, 253 S.W.3d 204, 208 (Tex. 2008) (A deficiency in any
requirement of section 74.351 may be cured by amending an expert report or by serving a
report from a separate expert.). 

Conclusion

 We affirm the trial court's order denying Pangburn's motion to dismiss. The reports
fail to comply with the requirements of Chapter 74 with respect to the claims against Day, 
Punay, and Baptist Hospital. We reverse the trial court's order denying the motions to
dismiss of Day, Punay, and Baptist Hospital. 

 When an appellate court reverses the trial court's denial of a motion to dismiss a
healthcare liability claim due to deficiencies in the elements of the report, the appellate court
may remand the case to the trial court to consider granting a thirty-day extension to cure the
deficiencies in the report. See Leland, 257 S.W.3d at 208; Lewis, 253 S.W.3d at 208. We
remand the case to the trial court to consider granting an extension to cure the deficiencies,
and for further proceedings consistent with this opinion. 

 AFFIRMED IN PART; REVERSED AND REMANDED IN PART.


 _________________________________

 DAVID GAULTNEY

 Justice

Submitted on September 24, 2009

Opinion Delivered December 17, 2009 


Before McKeithen, C.J., Gaultney and Horton, JJ.
1. Pangburn's motion to dismiss did not directly challenge Paquette's report because
according to the motion "she did not offer any opinions regarding Dr. Pangburn's standard
of care or that he caused Plaintiffs' damages."